*Everette William Johnson v. State of Maryland*, No. 11, September Term, 2021.  Opinion by Hotten, J.


**CRIMINAL LAW – INDICTMENTS AND CHARGING INSTRUMENTS – DUPLICITOUS CHARGES**

The constitutional guarantee to a unanimous jury verdict in a criminal case may be violated where a prosecutor introduces evidence of multiple distinct criminal incidents to prove a crime charged as a single count.  In such circumstances, the prosecutor should be required to elect to pursue one of the incidents underlying the charge, or the jury should be provided with a special instruction that it must unanimously agree as to which incident underlies any conviction.

**CRIMINAL LAW – INDICTMENTS AND CHARGING INSTRUMENTS – DUPLICITOUS CHARGES – SINGLE INCIDENT OR TRANSACTION**

In determining whether a series of criminal acts may underlie a single charge or multiple charges, courts should consider whether a juror could have reasonably perceived separate incidents, and therefore, based their convictions on different underlying material facts. Various factors may be helpful in this inquiry, including: acts occurring at different times or places and separated by intervening events; if the defendant reached a fork in the road between the acts and decided to invade another interest; if the first action concluded and the next act was motivated by a new impulse; if the jury must resolve different factual disputes concerning each action; and if the State presented the acts as separate to the jury. No individual factor is dispositive, as the central inquiry is whether a juror could have reasonably perceived the incidents as separate crimes based on the evidence presented and arguments made at trial.

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2021

_____

EVERETTE WILLIAM JOHNSON

v.

STATE OF MARYLAND
_____

Getty, C.J.,
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

_____

Opinion by Hotten, J.
Getty, C.J., McDonald and Gould, JJ.,
dissent.

_____

Filed: March 14, 2022

*McDonald, J., now retired, participated in
the hearing and conference of this case
while an active member of this Court; after
being recalled pursuant to Maryland
Constitution, Article IV, Section 3A, he
also participated in the decision and
adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Everette William Johnson ("Petitioner") was tried in the Circuit Court for Baltimore County for first-degree burglary, first-degree assault, second-degree assault, use of a firearm in the commission of a crime of violence, and illegal possession of a firearm after conviction of a disqualifying crime. He was acquitted of first-degree assault but convicted of the remaining charges. Although evidence was presented to the jury of two incidents, occurring within minutes of each other, that could have satisfied two counts each of first or second-degree assault and use of a firearm in the commission of a crime of violence, Petitioner was charged with a single count of each crime. The circuit court declined defense counsel's request after closing arguments that the jury be instructed that it must unanimously agree as to Petitioner's guilt for the same underlying incident to support a verdict regarding those counts.

Petitioner appealed to the Court of Special Appeals, which affirmed the circuit court in a 2-1 decision. The majority found that no special unanimity instruction or election between incidents was required, determining there was only a single ongoing incident at issue, as the two allegedly separate incidents occurred within a short period of time and space, and all in furtherance of Petitioner's burglary. The dissent disagreed, identifying the commission of two separate assaults involving two different weapons, and thus, concluded that Petitioner's conviction did not comply with the constitutional guarantee of a unanimous jury verdict for criminal defendants.

We granted *certiorari* to address the following question:

Whether a defendant's right to a unanimous jury verdict is violated when the State presents evidence of multiple incidents at trial to prove a single charged

count, in absence of an election between the incidents or a special jury instruction?

We answer in the affirmative and reverse the decision of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Underlying Incident

On August 1, 2018, Petitioner entered an unoccupied and unlocked house in Catonsville, Maryland. Sometime later, the homeowner, Jeanne Robin, returned with her minor son and discovered Petitioner in her attic. Ms. Robin testified that when she discovered Petitioner, he was holding her husband's antique rifle, which she believed to be inoperable and not loaded. She attempted to wrestle the rifle from Petitioner's hands, but Petitioner told her "this thing is loaded" and cycled its lever, which was the rifle's mechanism for allowing ammunition to be loaded. Ms. Robin then testified that she became concerned that the rifle was actually operable, since she had previously assumed that its lever was jammed. She yelled for her son, who was downstairs, to go outside, and she ran down the attic stairs. While Ms. Robin was downstairs, she called 911 to report the home invader, retrieved her handgun from a lockbox located in her bedroom closet, loaded the gun with bullets located in a different location from the lockbox, and then returned to the bottom of the stairs.

Armed with her handgun, Ms. Robin shouted up to Petitioner from the bottom of the attic stairs that she had called the police and would shoot him if he tried to come down the stairs. She testified that she was surprised to find Petitioner in the same place she had left him, stating:

> [I]n this whole thing, he has not fled. I have time to go down the stairs. Get into my bedroom. Into my closet. Open the lockbox. Get my gun. Get the speed loader. Load the gun. Close the gun. Get back to the door, and the man is still at the top of the stairs.

Ms. Robin closed and leaned against the attic stair door, attempting to detain Petitioner until the police arrived.[1] Petitioner, however, came down the stairs, managed to push through the door, and struggled with Ms. Robin over control of her handgun. During that struggle, the handgun discharged through Ms. Robin's right hand. Petitioner ultimately escaped from the home with Ms. Robin's handgun.[2] He was apprehended by police shortly thereafter.

### Legal Proceedings

### A. Circuit Court Proceeding

Petitioner was tried in the Circuit Court for Baltimore County for one count of first-degree burglary, one count of first-degree assault, one count of second-degree assault, one count of use of a firearm in the commission of a crime of violence, and one count of illegal possession of a regulated firearm after being convicted of a disqualifying crime. During closing arguments, the State made the following statements, among others, pertaining to the assault and use of a firearm in the commission of a crime of violence charges:

> He committed a first -- committed a first[-]degree burglary without question. He used a crime of violence during the first -- handgun -- firearm during the

---

[1] Ms. Robin testified that she was motivated to detain Petitioner because she feared that if he left the house, he would encounter her son who was outside on the porch.

[2] Petitioner had previously dropped a backpack filled with items from the Robins' home on the attic stairs, as it had gotten stuck while he pushed through the attic door.

commission of that first[-]degree burglary, initially that rifle he grabbed and also the handgun.

He also committed a first[-]degree assault during the burglary, and that was initially pulling the rifle on her, and then also the struggle over the gun and shooting her in the hand.

And again, in its closing rebuttal, the State argued:

It could not be anymore clear that the defendant is guilty as charged.

Guilty of the first[-]degree burglary of their home.

Guilty of the first[-]degree assault of Ms. Robin, not only up in the attic when he arms himself with their rifle, but when we move downstairs to the struggle and him firing that handgun. Firing that bullet through her hand.

Guilty of using that handgun in the commission of those crimes.

Guilty of using that rifle upstairs to try to complete the burglary.

Guilty of using that handgun during the struggle. And then guilty of being a person who has been convicted of a disqualifying crime and being in possession of that handgun. The defendant is guilty on all counts.

Thank you.

Thereafter, defense counsel requested that the court provide a supplemental instruction to the jury that "what they're finding [Petitioner] guilty or not guilty of is the allegation of firing the gun through Ms. Robin's hand, and that the firearm we're talking about is the revolver." The State replied that the charges pertained to one continuing criminal event and a breakdown of each individual action was unnecessary. The court ultimately denied defense counsel's request, reasoning that the jury had "listened to the elements of the crime . . . [and] listened to the instructions that include that opening

4

statement and closing argument are not evidence in the case."[3] The court noted, but overruled, defense counsel's objection to the court's denial of its requested supplemental instruction.

The jury acquitted Petitioner of first-degree assault but found him guilty of all other charges levied against him, including second-degree assault and use of a firearm in the commission of a crime of violence.[4]

## B. Opinion of the Court of Special Appeals

Petitioner filed a timely appeal to the Court of Special Appeals, asking whether the circuit court "abused its discretion in failing to provide a supplemental instruction after the State argued in closing that the jury could rely on either of two distinct incidents to find [him] guilty of crimes that were charged as single counts."[5] *Johnson*, 2021 WL 408845, at *1. The Court of Special Appeals affirmed the circuit court in a 2-1 unreported opinion. *Id.* at *3. Citing to *Cooksey v. State*, 359 Md. 1, 752 A.2d 606 (2000) and *Mohler v. State*,

---

[3] The jury was given the following general unanimity instruction: "[y]our verdict must represent the considered judgment of each juror and must be unanimous. In other words, all 12 of you must agree."

[4] As recognized by the Court of Special Appeals, the issues raised in Petitioner's appeal and subsequent petition for writ of *certiorari* to this Court only pertain to his second-degree assault and use of a firearm in the commission of a crime of violence convictions. *Johnson v. State*, No. 1329, Sept. Term, 2019, 2021 WL 408845, at *1 (Md. Ct. Spec. App. Feb. 5, 2021).

[5] Unrelated to his appeal to this Court, Petitioner also asked the Court of Special Appeals, "[w]hether the trial court abused its discretion in refusing to ask potential jurors during *voir dire* whether they had strong feelings about firearm laws in this State or country." *Id.* at *1. The Court held that it did not. *Id.* at *4.

120 Md. 325, 87 A. 671 (1913), the majority reasoned that all of Petitioner's conduct "was committed as part of a single incident[]" that was "in furtherance of the burglary." *Id*. at *3. The majority specifically focused on the fact that all of the alleged criminal actions occurred within a short span of time and space. *Id*. at *3.

Judge Friedman dissented, disagreeing that Petitioner's actions were all part of a single incident. *Id.* at *4 (Friedman, J., dissenting). His opinion stated:

> As I understand the record, there were allegations of two separate assaults—one at the top of the stairs, one at the bottom of the stairs—in two different modalities, and even involving two separate weapons. If the State had charged both assaults, Johnson might well have been convicted of both. As it is, however, the State only charged one but specifically told the jury it could convict on evidence of either. As a result, in my view, we cannot know of which assault Johnson was convicted. Although it might not seem likely, it is possible that the jury was divided on whether to convict of the assault at the top of the stair[s] and divided on whether to convict of the assault at the bottom of the stairs, but all agreed to convict him of either one assault or the other. Because we don't know, I don't think this conviction complied with our constitutional requirements. *See Cooksey v. State,* 359 Md. 1, 8–9, 752 A.2d 606, 609–610 (2000). I respectfully dissent.

*Id.* (Friedman, J., dissenting) (footnote omitted).

Petitioner filed a petition for *certiorari* to this Court, which we granted on May 11, 2021. *Johnson v. State*, 474 Md. 633, 255 A.3d 170 (2021).

## DISCUSSION

### Standard of Review

This Court has held that "[t]he decision of whether to give supplemental instructions is within the sound discretion of the trial judge and will not be disturbed on appeal absent a clear abuse of discretion." *Sidbury v. State*, 414 Md. 180, 186, 994 A.2d 948, 951 (2010);

6

*see also Lovell v. State,* 347 Md. 623, 657, 702 A.2d 261, 278 (1997) ("Whether to give a jury supplemental instructions in a criminal cause is within the discretion of the trial judge."). The discretion afforded to a trial court, "is not unlimited; when the issue is whether a constitutional right has been infringed, we make our own independent constitutional appraisal." *Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001).

## Contentions of the Parties

Petitioner argues that the circuit court erred in failing to give the jury a special unanimity instruction or require the State to elect a single incident as the basis for criminal liability where it presented evidence of two distinct incidents, either of which could have supported a conviction for second-degree assault and use of a firearm in the commission of a crime of violence. Petitioner contends that the incident with the rifle at the top of the attic stairs was distinct from the incident at the bottom of the stairs with the handgun, first, because the State told the jury in closing arguments that the two events were distinct, second, because the two incidents involved different legal theories and factual issues, and finally, because the events were not so close in space and time as to constitute a single incident. Thus, Petitioner argues that the State should have been required to elect between the two incidents, or, the jury should have been instructed that it must be unanimous as to which underlying incident supported its conviction.

The State counters that the Court of Special Appeals correctly determined that Petitioner's encounters with Ms. Robin were part of a single continuous incident, and therefore, that a special unanimity instruction or election between incidents was not

7

required. It reasons that the events occurred within a short period of time and in a confined space, and denies that the prosecutor portrayed the incidents as separate a trial.

**Multiple Charges and the Right to a Unanimous Jury Verdict**

Article 21 of the Maryland Declaration of Rights and the Sixth Amendment of the United States Constitution guarantee criminal defendants the right to a unanimous jury verdict. MD. CONST., Decl. of Rts. art. 21 ("That in all criminal prosecutions, every man hath a right to . . . a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."); U.S. CONST. amend. VI; *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1391 (2020) (holding that the "Sixth Amendment right to a jury trial—as incorporated against the States by way of the Fourteenth Amendment—requires a unanimous verdict to convict a defendant of a serious offense[]"). "Unanimity is indispensable to the sufficiency of the verdict." *Jones v. State*, 384 Md. 669, 683, 866 A.2d 151, 159 (2005) (emphasis omitted) (quoting *Ford v. State*, 12 Md. 514, 549 (1859)).

The constitutional right to a unanimous jury verdict is threatened when a charge levied against a criminal defendant is duplicitous. *See Cooksey*, 359 Md. at 9–10, 752 A.2d at 610. This Court has long defined duplicity as "the joinder of two or more distinct and separate offenses in the same count." *Id.* at 7, 752 A.2d at 609 (quoting *State v. Warren*, 77 Md. 121, 122, 26 A. 500, 500 (1893)). Duplicitous charges create a constitutional unanimity concern because a court cannot be certain "that a verdict rendered on a duplicitous count truly represents the unanimous agreement of the jury as to each offense charged in the count[,]" or whether some jurors found guilt on one offense but not the other,

8

and vice versa. *Id.* at 9–10, 752 A.2d at 610. The prohibition against duplicitous charges has also been codified as a rule of pleading in Maryland Rule 4-203(a).[6]

This Court's prohibition on duplicitous charges has generally addressed charges that were duplicitous on their face. *See, e.g.*, *Cooksey*, 359 Md. at 4–5, 752 A.2d at 607 (holding an indictment was duplicitious that charged a criminal defendant with committing a sexual offense by engaging in a "sexual act" in a "continuing course of conduct" over the time span of a year, in a single count); *Kirsner v. State*, 183 Md. 1, 6, 36 A.2d 538, 540 (1944) (holding an indictment duplicitous that charged, in a single count, various violations of the Baltimore City building code). The same constitutional unanimity concerns arise where the State presents evidence of multiple distinct incidents to prove a crime charged as a single count, namely, that the jury will not unanimously agree as to which criminal incident the defendant committed.[7] *See Cooksey,* 359 Md. at 9, 752 A.2d at 610 ("[J]ury unanimity

---

[6] Maryland Rule 4-203(a) provides that two or more offenses are permitted to "be charged *in separate counts* of the same charging document if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." (Emphasis added). In *Cooksey*, we described this Rule as an "indirect[]" codification of the prohibition against duplicity in the criminal context, reasoning that "[b]y limiting what may be charged even in separate counts of a single charging document, the Rule rather clearly precludes the charging of separate offenses in a single count." 359 Md. at 8, 752 A.2d at 609.

[7] This issue is distinguishable from the question presented in *Watts v. State*, where the court found that a jury was not required to unanimously agree whether the *modality* through which a defendant committed second-degree assault in a single action was battery or intent to frighten. 457 Md. 419, 440, 179 A.3d 929, 941 (2018). In contrast, the present issue concerns factually separate *incidents* and the requirement that jurors must be unanimous as to which factual incident underlies a guilty verdict.

9

concerns arise because a court cannot always be certain that a verdict rendered on a duplicitous count truly represents the unanimous agreement of the jury as to each offense charged in the count."). In such circumstances, the majority of our sister states have determined that it is proper to require the prosecutor to elect between the various incidents or to give a special jury instruction, informing the jurors that they must agree that the defendant is guilty based on the same underlying criminal incident.[8]

In *Cooksey*, this Court examined at length the rule against duplicitous charges and under what circumstances separate criminal acts may permissibly be combined to create a single punishable offense.[9] 359 Md. at 7–11, 752 A.2d at 609–11. This Court found that

---

[8] *See, e.g.*, *Ramsey v. State,* 355 P.3d 601, 602 (Alaska Ct. App. 2015) ("When the State presents evidence that a defendant committed multiple different acts that could each support a criminal conviction, the court is required to instruct the jury that [it] must be factually unanimous as to which act the defendant committed.") (footnote omitted); *Williams v. United States*, 981 A.2d 1224, 1228 (D.C. 2009) ("[W]hen a single count encompasses two (or more) factually separate criminal incidents, the Sixth Amendment requirement of a unanimous verdict obliges the judge to instruct the jury that it must reach unanimous agreement as to a particular incident in order to find the defendant guilty as charged.") (footnote omitted); *Ayers v. State*, 844 A.2d 304, 309 (Del. 2004) ("A specific unanimity instruction is required . . . if one count encompasses two separate incidents, either of which could support a defendant's conviction for a particular charge.") (cleaned up); *State v. Allen*, 232 P.3d 861, 864 (Kan. 2010) ("In a multiple acts case, either the State must inform the jury which act to rely upon in its deliberations or the court must instruct the jury to agree on the specific criminal act."); *Commonwealth v. Palermo*, 125 N.E.3d 733, 742 (Mass. 2019) (holding a special juror unanimity instruction "is required when, on a single charged offense, the prosecutor presents evidence of separate, discrete incidents, any one of which would suffice by itself to make out the crime charged") (internal quotations omitted).

[9] In that case, this Court considered whether it was unconstitutionally duplicitous for a defendant to be charged with a single count of a sexual offense in the second degree and a single count of a sexual offense in the third degree based on a series of sexual offenses

(continued. . .)

10

there are at least four different, but occasionally overlapping, contexts in which such an "*e*

*pluribus unum* approach"[10] is permitted:

> (1) when the acts are committed as part of a single incident or transaction;
> (2) when they are simply descriptive of a single offense; (3) when they are
> committed at different times but in a continuing course of conduct with a
> single objective; and (4) when a single offense may be committed in two or
> more different ways.

*Id.* at 11, 752 A.2d at 611.  Charging a series of criminal acts that falls into one of these

categories under a single count will not violate constitutional and statutory prohibitions of

duplicitous charges.  *See id.*, 752 A.2d at 611.

**Petitioner's Actions as a Single Incident or Transaction[11]**

The central disagreement in this case is whether the sequence of events,

commencing with Petitioner allegedly "brandishing" the rifle in the Robins' attic and

---

(. . . continued)
committed at different times over an extended period of time on the same victim.  *Cooksey*,
359 Md. at 3, 752 A.2d at 607.  We found that those charges were facially duplicitous, as
a second- or third-degree sexual offense is a "single-act" crime that could not encompass
in one count various distinct incidents occurring over a prolonged period of time.  *Id.* at 23,
752 A.2d at 618.  This Court went on to find that the charges of sexual child abuse under
Maryland Code, Article 27, § 35C, *repealed by* Acts 2002, c. 26, § 1, eff. Oct. 1, 2002,
based on the same conduct were not unconstitutionally duplicitous, as "abuse" under the
statutory definition could be committed either through a single act or a continuing course
of conduct consisting of multiple acts.  *Id.* at 23–24, 752 A.2d at 618.

[10] The phrase "*e pluribus unum*," meaning "out of many, one" was used in *Cooksey*
to describe circumstances in which separate criminal acts may combine to create a single
punishable offense.  359 Md. at 11, 752 A.2d at 611; *see also e pluribus unum*, MERRIAM-
WEBSTER, https://perma.cc/9N45-25PN (last visited Nov. 30, 2021).

[11] The Dissent argues that Petitioner's constitutional duplicity challenge is not
preserved for appellate review for a myriad of reasons.  *See Johnson v. State*, No. 11 Sept.

(continued. . .)

concluding with the struggle over the handgun and the shooting of Ms. Robin's hand,

constitutes a "single incident or transaction" as discussed in *Cooksey*, 359 Md. at 11, 752

(. . . continued)

Term, 2021, slip op. at 19–38 (Gould, J., dissenting).  Maryland Rule 8-131(b)(1) provides that:

> *Prior Appellate Decision.*  Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals.  Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition.

Here, neither the State's brief to this Court, nor its brief to the Court of Special Appeals alleged that Petitioner's constitutional duplicity argument was not preserved for appellate review.  *See Johnson*, 2021 WL 408845, at \*1 n.4.  We are therefore not required to consider the issue under Md. Rule 8-131(b)(1).

The Dissent nonetheless argues that we should *sua sponte* exercise our discretion to consider the preservation issue at this late stage and reject Petitioner's constitutional claim on those grounds alone.  *Johnson*, slip op. at 35–38 (Gould, J., dissenting).  We do not agree.  This Court has stated that "except in most extraordinary circumstances, we will consider on an appeal resulting from a grant of a writ of certiorari only those questions raised in the petition and matters relevant to those questions[.]"  *Walston v. Sun Cab Co*., 267 Md. 559, 569, 298 A.2d 391, 397 (1973).  We have declined to consider even "errors of Constitutional dimension" where a party fails to preserve the issue for appeal.  *See Robinson v. State*, 410 Md. 91, 103, 976 A.2d 1072, 1079 (2009).  We are much less compelled to exercise our discretion to consider an argument that would *prevent* Petitioner from asserting a constitutional right, where such an argument has *never* been advanced by the State.  We do not agree with the Dissent that defendants will have a tactical advantage as a result of our opinion.  *See Johnson*, slip op. at 36–38 (Gould, J., dissenting).  We are not dismissing the obligation of defendants to preserve a duplicity claim at trial.  Rather, we are declining to comment on the merits of Petitioner's failure to preserve *his* duplicity claim at trial because the State never made an argument on such grounds either before this Court or the Court of Special Appeals.  Neither do we agree with the Dissent that the substance of our rule on duplicitous charges, set forth below, should prevent us from deciding the duplicity issue without considering the preservation of the argument.  *See id.*

A.2d at 611. *See Johnson*, 2021 WL 408845, at *2–3. The Court of Special Appeals found that it was, reasoning that "[a]ll of [Petitioner's] conduct while in the Robin home were [sic] in furtherance of the burglary[]" and that the whole of his confrontation with Ms. Robin "occurred within a short span of time and in a somewhat confining space[.]" *Id.* at *3. We do not agree that this was a sufficient basis for determining whether Petitioner's two encounters with Ms. Robin constituted a "single incident or transaction." *Cf. Bussie v. State*, 115 Md. App. 324, 335, 693 A.2d 49, 54 (1997) (maintaining "that mere physical closeness and chronological syncopation of criminal activity are not alone sufficient to render evidence of other crimes mutually admissible based upon 'same transaction' relevance").

In *Cooksey*, we cited to *State v. Warren*, as an example of a circumstance where multiple criminal acts could be considered a "single incident or transaction." 359 Md. at 11–12, 752 A.2d at 611. *Warren* involved a defendant charged in a single count with stealing various sums of money belonging to several different owners, at the same time. 77 Md. at 121, 26 A. at 500. This Court held that "the stealing of several articles at the same time, whether belonging to the same person or to several persons, constituted but one offense. It is but one offense because the act is one continuous act,—the same transaction[,]" and therefore concluded that the value of the stolen property could be aggregated to determine whether the offense constituted grand or petit larceny. *Id.* at 122–23, 26 A. at 501. In *Stoddard v. State*, this Court explained that it was dispositive for the "single transaction" theory that the offenses in *Warren* were committed "*at the same time.*"

13

395 Md. 653, 670, 911 A.2d 1245, 1254 (2006) (summarizing the discussion of *Warren* in *Cooksey*, 359 Md. at 11, 752 A.2d at 611).  Unlike the theft at issue in *Warren*, some crimes, including ordinary assault, "tend to be committed in a single continuous episode rather than in a series of individually chargeable acts." *Owens v. United States*, 497 A.2d 1086, 1096 (D.C. 1985).  "The fact that a criminal episode of assault involves several blows or wounds, and different methods of administration, does not convert it into a case of multiple crimes . . . ." *Id.*

### A.  The Standard for Determining a Single Incident or Transaction

This Court has yet to outline a guiding standard for trial courts in determining whether a course of conduct involving separate criminal acts may be considered a singular incident or transaction, in order to satisfy the constitutional requirement of juror unanimity. As discussed above, underlying this Court's prohibition on duplicitous charges are concerns of being unable to discern from a guilty verdict rendered on a duplicitous count whether the jury unanimously found guilt as to any of particular offense contained in the count. *See Cooksey*, 359 Md. at 9–10, 752 A.2d at 610.  As such, any inquiry into whether a series of criminal acts underlying a single charged crime may be considered a "single incident or transaction," *id.* at 11, 752 A.2d at 611, must center on whether a juror could reasonably perceive separate criminal incidents underlying the singular charge and base their convictions on such different underlying incidents.  In circumstances where a charge is not facially duplicitous but becomes duplicitous based on evidence of multiple distinct

14

incidents presented at trial to prove a single charged count, we agree with our sister states[12] that the prosecutor should be required to elect between the incidents, or the jury should be provided with a special instruction that it must unanimously agree as to which distinct criminal incident underlies its decision to convict.[13]

The District of Columbia Court of Appeals applied a similar standard in *Hagood v. United States*, 93 A.3d 210 (D.C. 2014), to facts somewhat analogous to those at issue here. That case involved two defendants who were tried for attempting to break into the same apartment twice while armed within a span of ten minutes but were each charged with only a single count of first-degree burglary and assault with a deadly weapon. *Id.* at 214–15. The court found that, "[i]n determining whether a special unanimity instruction was required, we need only determine that it was possible, based on the evidence, for the jury to reasonably perceive separate incidents and then base [its] convictions on different factual predicates." *Id.* at 220–21. In making this determination, it outlined a list of factors to

---

[12] *See supra* note 8.

[13] In *Cooksey*, this Court rejected the State's suggestion of resolving issues posed by facially duplicitous pleadings by requiring the State to elect between incidents at the end of trial or giving the jury a special unanimity instruction. 359 Md. at 26–27, 752 A.2d at 619–20. This Court correctly determined that allowing a trial to proceed on a duplicitous count until its conclusion would be an inefficient and ineffective method of addressing the issues posed by facially duplicitous pleadings, which can be identified and addressed before a trial commences. *Id.*, 752 A.2d at 619–20. Ideally, of course, the issue will be avoided by a prosecutor charging multiple counts where there is evidence of multiple distinct incidents that could meet the definition of a crime. However, in circumstances where duplicity concerns arise only as evidence is presented and arguments are made at trial, the solutions of the State electing between the incidents or giving the jury a special unanimity instruction satisfy constitutional unanimity requirements without the need for a new trial.

15

consider when determining whether the actions underlying a criminal charge are factually distinct, including:

> (1) when the acts have occurred at different times and were separated by intervening events, (2) when they occurred in different places, (3) when the defendant has reached a fork in the road and has decided to invade a different interest, or (4) when the first act has come to an end and the next act is motivated by a fresh impulse.

*Id.* at 218 (internal quotations omitted) (quoting *Gray v. United States*, 544 A.2d 1255, 1258 (D.C. 1988)). The court emphasized that these factors are not dispositive but rather "offer guideposts in resolving the central question in determining whether a special unanimity instruction was required: whether a reasonable jury 'must have' agreed upon one particular set of facts as the factual predicate for the verdict or whether some jurors 'could have' believed one set of facts while other jurors could have believed another." *Id.*

In the same vein as *Hagood*, Maryland case law grappling with whether certain incidents may be considered a part of the "same transaction" in other contexts has focused on whether there was either a break in time or a separating intervening event between the incidents. *See, e.g.*, *Kelley v. State,* 402 Md. 745, 757, 939 A.2d 149, 156 (2008) (quoting *Richardson v. Commonwealth*, 489 S.E.2d 697, 700 (Va. App. 1997)) (holding that in determining whether the theft of various items can be considered a part of the same larceny under the common law "single larceny doctrine," factors to consider include "the location of the items stolen, the lapse of time between their taking, the general and specific intent of the thief, the number of owners, and whether intervening events occurred between the takings"); *Purnell v. State*, 375 Md. 678, 698, 827 A.2d 68, 80 (2003) (holding that two

16

charges of resisting arrest violated double jeopardy because all the criminal activity occurred in the same place and time and "there was no break, for any appreciable time, in the sequence of events, which could categorize the counts charged as separate and distinct acts"); *Smith v. State*, 232 Md. App. 583, 600, 158 A.3d 1154, 1164 (2017) (finding that evidence of the defendant spitting was admissible to support the charge of threatening a state official because the spitting and oral threats occurred in the same location, in the same half hour interview, and there were no intervening events separating the two incidents); *Washington v. State*, 200 Md. App. 641, 653, 28 A.3d 164, 171 (2011) (finding that, for double jeopardy purposes, the fleeing or eluding police charges that began in a car chase and ended in a foot chase were based on one "act or transaction," as there "was no lapse in time in which [the officer] ceased trying to apprehend the appellant and the appellant ceased trying to get away, only to have the attempt to stop and attempt to get away resume later"). As such, we conclude that the *Hagood* factors, with a particular focus on a lapse in time and intervening events between incidents, may be helpful in determining whether a juror might perceive a series of acts underlying a criminal charge as distinct incidents.

Although we conclude that the four *Hagood* factors are helpful, the factors are not dispositive, to our inquiry. 93 A.3d at 218–19. In determining whether a reasonable juror might perceive incidents as distinct, is it also helpful to consider whether the jury was tasked with resolving different factual disputes pertaining to the incidents. This methodology was utilized by the Arizona Court of Appeals in *State v. Klokic* in determining that a defendant's actions of twice pointing a gun in a threatening manner during a single

road rage incident should have been considered two separate assaults. 196 P.3d 844, 850 (Ariz. Ct. App. 2008). The court reasoned the defendant provided different defenses as to each alleged assault, and thus "there [was] a distinct possibility that the jury was not unanimous as to the act or acts that gave rise to Klokic's criminal liability."[14] *Id.* at 850–51.

Finally, we must consider whether the State invited the jury to perceive the incidents as separate. The likelihood that a reasonable juror will perceive multiple incidents underlying a single charged count is enhanced if the prosecutor encourages them to perceive them as distinct. Many of our sister states have come to the same conclusion. The New Mexico Supreme Court in *State v. Consaul*, required a special jury instruction on unanimity where the "prosecutor invited the jury to convict [the defendant] of child abuse whether or not the jury agreed on what criminal act [he] actually committed." 332 P.3d 850, 855 (N.M. 2014). The court reasoned that "[j]urors should not be left free, let alone encouraged by the prosecutor, each to go his or her own way when it comes to determining what criminal conduct—if more than one act is alleged—caused the child's harm. The jury

---

[14] Although *Klokic* involved distinct affirmative defenses, its reasoning was not so limited. It relied in part on the Arizona Supreme Court decision in *State v. Davis*, which found the inclusion of two incidents of sexual assault under the same count to be duplicitous because the defendant had an alibi for one incident and offered evidence that the victim had sexual contact with a different individual for the other incident. *Id.* at 849 (summarizing *State v. Davis*, 79 P.3d 64, 76 (2003) (en banc)); *id.* at 851 ("Thus, as in *Davis*, although some jurors might have dismissed Klokic's claims across the board, it is entirely possible that different jurors believed different facts with respect to each of the acts.").

18

needs to agree unanimously on what conduct caused harm to the child." *Id.* at 855. Similarly, the California Supreme Court found in *People v. Diedrich* that although a charge of bribery could logically take place over a long period of time, a special unanimity instruction was required because the prosecutor argued to the jury that the "crime [was] completed" after the first of two incidents evidencing bribery. 643 P.2d 971, 980 (Cal. 1982).[15]

**B. Application to this Case**

Applying the standard discussed above to the facts of this case, we conclude that the jury could have reasonably perceived two distinct assaults and two distinct uses of a firearm in the commission of a crime of violence from the evidence presented and arguments made in Petitioner's trial. Although the two incidents were separated by only a matter of minutes, there were intervening events between the alleged assault with the rifle at the top of the stairs and the alleged assault with the handgun at the bottom of the stairs. Ms. Robin ran downstairs, called 911, retrieved her handgun from a lockbox, loaded the gun with bullets

---

[15] *See also Hagood*, 93 A.3d at 220 ("From this evidence of two confrontations and the government's characterization during closing arguments of appellants' actions as 'two burglaries' and 'two shootings,' the jury could reasonably have perceived two factually distinct burglaries and assaults."); *State v. White Face*, 857 N.W.2d 387, 395–96 (S.D. 2014) (holding that because "the State invited the jury to convict on either incident" of child abuse, it could not "be reasonably certain that White Face was found guilty by a unanimous jury"); *State v. Cordeiro*, 56 P.3d 692, 709 (Haw. 2002) (holding that a special unanimity instruction was required because, among other things, the prosecutor "represented to the jury that only a single offense was committed but that either act could support a guilty verdict as to first degree robbery[]"); *Perley v. State*, 947 So. 2d 672, 674 (Fla. Dist. Ct. App. 2007) ("By allowing the State to tell the jury it could convict Perley for either instance of escape, the trial court compromised the jury's ability to render a unanimous verdict.").

located in a different location from the lockbox, and returned to the bottom of the stairs.

These intervening events were explicitly emphasized by the State through the testimony of

Ms. Robin and in the prosecutor's closing arguments. In her testimony at trial, Ms. Robin

recounted the intervening events between the two incidents, stating:

> . . . I see [Petitioner] still somehow walking down -- in this whole thing, he has not fled. I have time to go down the stairs. Get into my bedroom. Into my closet. Open the lockbox. Get my gun. Get the speed loader. Load the gun. Close the gun. Get back to the door and the man is still at the top of the stairs.
>
> So at this point, I'm totally weirded out. I mean, at no point has this guy tried to bolt. He hasn't -- it was really weird that he just was sauntering down my stairs.

The State reiterated this point in its closing arguments, stating:

> You can hear [Ms. Robin's] description of having to go, you know into the other room, into her bedroom. Into the wall safe. Open the wall safe. Get the gun out, and then get the ammunition from another place, close by but a different place. *It takes times [sic] to do all those things*. And to call 911 at the same time.
>
> What does [Petitioner] do[?] *He sticks around.* He gets his backpack. . . . what does he do while she's doing those things downstairs, instead of run out of the home, get out of there as quick as possible[?] Remember the language that she used. I think the word was "sauntering" when she came back and she saw him coming back down the steps. He's still trying to make his crime succeed.

(Emphasis added).

This emphasis on Petitioner's affirmative decision to "stick[] around" can also be

categorized as a "fork in the road" moment where Petitioner decided to "invade a different

interest[]" pursuant to the third *Hagood* factor. *See Hagood*, 93 A.3d at 218. While Ms.

Robin was in her bedroom, Petitioner had a clear opportunity to leave, but instead

affirmatively chose to stay in the exact same place she had left him. It was not until Ms. Robin returned to the stairs with her gun minutes later and informed Petitioner that the police were on their way, that he attempted to leave the attic.

For similar reasons, when Ms. Robin ran down the stairs after her initial encounter with Petitioner, it is clear that "the first act ha[d] come to an end and the next act [was] motivated by a fresh impulse[]" pursuant to the fourth *Hagood* factor. *Id.* at 218. When Ms. Robin ran down the stairs and into her bedroom, the alleged threat of immediate bodily harm as a result of Petitioner brandishing the rifle and telling her that it was loaded had come to an end. The incident at the bottom of the stairs also appeared to be motivated by a fresh impulse from the Petitioner. Rather than attempting to continue the burglary, as the State argued he was attempting to do in the attic while Ms. Robin was downstairs, when Petitioner struggled with Ms. Robin to get out of the attic stairway door, it appeared that he was trying to leave the house before the police arrived. Thus, Petitioner was motivated by a "fresh impulse[]" in his encounter with Ms. Robin at the bottom of the stairs. *See id.* at 218. This is further evidenced by fact that Petitioner abandoned the backpack filled with the Robin's stolen items during his struggle at the bottom of the stairs.

The distinction between the incident at the top of the stairs with the rifle and the incident at the bottom of the stairs with the handgun comes into even greater relief when we focus on the charge of a use of a firearm in the commission of a crime of violence. The two incidents involved the use of two separate firearms at two distinct times. Petitioner not even aware of the existence of Ms. Robin's handgun at the time he used the rifle to

21

frighten Ms. Robin. Petitioner's impulse to shoot Ms. Robin with the handgun did not arise until the handgun was introduced by Ms. Robin – after Petitioner had already used the rifle to frighten Ms. Robin at the top of the stairs. This clear demarcation between the uses of the two firearms, in turn, aids in distinguishing between the two assaults, both of which were premised on Petitioner's use of the firearms.

The parties dispute whether the incident at the top of the stairs with the rifle and the incident at the bottom of the stairs with the handgun should be characterized as occurring in the same place pursuant to the second *Hagood* factor. The State argues that these two incidents did occur in the same place, namely, the stairs to the attic, while Petitioner describes them as occurring in two different places: in the attic at the top of the attic steps and outside the door at the bottom of the steps. For purposes of our analysis, it is not important whether the incidents are described as occurring in the same place or different places. More critical is the separation of the two incidents as discussed above, namely, the break in the action and intervening events that created a "fork in the road" during which Petitioner made an affirmative decision to "stick[] around." *See id.* at 218.

Further bolstering our determination that a jury could have reasonably perceived the incidents as separate is the fact that the jury was tasked in this case with resolving different factual disputes pertaining to each incident. The State alleged in support of its assault and use of a firearm in the commission of a crime of violence charges that during the episode at the top of the attic stairs, Petitioner brandished the rifle to Ms. Robin and told her "this thing is loaded[.]" Defense counsel disputed this allegation, claiming that Petitioner was

holding the rifle, not in an attempt to threaten Ms. Robin, but in an attempt to steal it, focusing on the fact that Ms. Robin never testified that Petitioner pointed the rifle at her, but rather that he held it upright and titled it backwards. Defense counsel also disputed whether Petitioner told Ms. Robin that the rifle was loaded or cycled its lever, pointing to her failure to tell police who interviewed her shortly after about those details of the incident. Pertaining to the incident at the bottom of the stairs, defense counsel disputed the assault and use of a firearm in the commission of a crime of violence charges by arguing that Petitioner was simply trying to leave the house, grabbed the handgun to prevent Ms. Robin from shooting him, and that the gun went off accidently during their struggle. It is possible that some jurors believed defense counsel's version of the incident with the rifle, and it is possible that other jurors believed defense counsel's version of the incident with the handgun. We have no way of knowing, based on its guilty verdict, whether a unanimous jury found Petitioner guilty of second-degree assault or use of a firearm in the commission of a crime of violence for either incident.

Finally, this Court finds it conceivable that a reasonable juror could have believed there to be two distinct incidents underlying the assault and use of a firearm in the commission of a crime of violence charges because the State encouraged the jury to view the incidents as separate at trial. During closing arguments, the State told the jury that Petitioner committed a first-degree assault "initially [by] pulling the rifle on [Ms. Robin], and then also [in] the struggle over the gun and shooting her in the hand." Again, in closing rebuttal arguments, the State urged the jury to find Petitioner "[g]uilty of the first-degree

23

assault of Ms. Robin, *not only up in the attic* when he arms himself with their rifle, *but when we move downstairs* to the struggle and him firing that handgun. Firing that bullet through her hand." (Emphasis added). In a similar way, the State bifurcated the incidents underlying the use of a firearm in the commission of a crime of violence charge, stating that Petitioner's use of a firearm during the burglary included "initially [the] rifle he grabbed and also the handgun." It similarly went on to state in its closing rebuttal arguments that the jury should find Petitioner "[g]uilty of using that rifle upstairs to try and complete the burglary[] [and] [g]uilty of using that handgun during the struggle." In addition, the State's emphasis on the break between the incidents and the time period when Ms. Robin went downstairs, called 911, and retrieved her gun, similarly invited the jury to perceive the incidents as separate.

In applying this standard, we reiterate that the course of events should not be viewed from the prospective of Ms. Robin or Petitioner, but from the prospective of a reasonable juror. Here, the State's emphasis at trial on the intervening events between the incidents and Petitioner's affirmative decision to "stick around" during that time, as well as State's presentation of the incidents as separate in its closing, make it particularly likely that a reasonable juror could perceive two separate incidents instead of one. Tasking the jury with resolving different factual disputes pertaining to each of the incidents further reinforced the likelihood that it could view them as separate. This is true even though, as the Dissent points out, it is possible that neither Ms. Robin nor the Petitioner actually viewed any "fork in the road" or differing motivation between their two encounters. *See*

24

*id.* at 218 ("[O]ur inquiry focuses on the jury's perception of the evidence presented at trial. It does not focus on the defendant's choice of actions at the time of the alleged crime.") (Emphasis omitted).

Petitioner's case is comparable to *Hagood*, where the District of Columbia Court of Appeals determined a single charge of attempted armed burglary and assault with a dangerous weapon to be duplicitous. *Id.* at 220–21. In that case, two armed men attempted to break into an apartment, but its occupants were able to successfully push them out. *Id.* at 214–15. The men briefly went outside, but a few minutes later they entered the same apartment but again were quickly pushed out by its occupants. *Id.* at 215. Shots were fired during both of these encounters. *Id.* The court found that a special unanimity instruction was necessary for the charges of attempted armed burglary and assault with a dangerous weapon, reasoning, in part, that

> [w]hile it is true that both incidents occurred at the same apartment, involved the same parties, and took place within a relatively short time— approximately ten minutes—of each other, these facts alone are not determinative. It is significant that in this case, when the trial is viewed as a whole, the jury was presented with evidence of what the government referred to in closing as "two burglaries" and "two shootings[.]"

*Id.* at 219–20 (footnote and internal citations omitted). The court emphasized that "a single purpose and a single criminal action are not necessarily the same thing," and pointed out that the jury in that case was tasked with resolving different factual disputes pertaining to two incidents, making it such that a jury could "reasonably perceive separate incidents and then base [its] convictions on different factual predicates." *Id.* at 221. The same is true in

Petitioner's case, as the State emphasized the separation between two incidents at trial, and the jury was tasked with resolving different factual disputes as to each incident.

We do not agree with the Dissent's assertion that Petitioner's case is more akin to *Guevara v. United States*, 77 A.3d 412 (D.C. 2013). *Johnson*, slip op. at 12–14 (Gould, J., dissenting). In that case, the District of Columbia Court of Appeals found that a special unanimity instruction was not required where three separate threats to a victim's life were made during the course of his hour-long abduction. *Guevara*, 77 A.3d at 418–19. The defense never requested a special unanimity instruction at trial, and the court found that the trial court did not commit plain error by failing to give such an instruction. *Id.* at 419–20. In addition to considering that all of the threats occurred during the abduction and that they were communicated in the same manner, to the same person, and with the same intent, the court pointed to the fact that the jury was tasked with resolving the same factual dispute as to each threat, namely, whether the victim had correctly identified the defendant as one of the perpetrators.[16] *Id.* at 420–21. Thus, "if the jury rejected [defendant's] defense as to one of the threats, it necessarily rejected it as to all three threats[.]" *Id.* at 421. As discussed above, the same is not true in Petitioner's case, as some jurors could have easily believed defense counsel's theory that Petitioner was not threatening Ms. Robin with the rifle in the

---

[16] Although we characterize this consideration as resolving a factual dispute, the District of Columbia Court of Appeals refers to this as a consideration of whether the incidents were "legally separate," meaning that different legal defenses could applied to each. *Id.* at 421. It is unimportant for our purposes how exactly this consideration is framed.

attic but stealing it instead, and not believed its theory that the handgun was accidently discharged into her hand, or vice versa. We reiterate that no single factor is dispositive, and the central inquiry remains whether jurors could have reasonably perceived the incidents as separate, such that some of them could have based their conviction on an entirely different set of underlying facts than other jurors.[17]

Considering the foregoing, we conclude that the jury could have reasonably perceived two separate incidents underlying the second-degree assault and use of a firearm in the commission of a crime of violence charges. As such, the incidents cannot be categorized as a "single incident or transaction[,]" such that the State's decision to charge only a single count of second-degree assault and use of a firearm in the commission of a crime of violence could be considered not unconstitutionally duplicitous. *See Cooksey* 359 Md. at 11, 752 A.2d at 611.

---

[17] Contrary to the Dissent's assertions, we cannot deduce, based on the jury's acquittal of Petitioner's first-degree assault charge, which factual incident underlies the jury's conviction for second-degree assault and use of a firearm in the commission of a crime of violence. *See Johnson*, slip op. at 3–5 (Gould, J., dissenting). This Court has expressly permitted factually inconsistent verdicts, which are "illogical merely[,]" although not legally inconsistent. *McNeal v. State*, 426 Md. 455, 466, 44 A.3d 982, 988 (2012). This is because we have recognized that "[j]uries may engage in internal negotiations, compromise, or even make mistakes; however, we cannot divine whether the inconsistency is the product of lenity. We will not risk disturbing a verdict for the wrong reasons." *Id.* at 472, 44 A.3d at 992. Because we permit a jury's verdict to be factually inconsistent, or in other words, illogical, we cannot not make logical deductions about the facts that must underly one jury verdict based on the jury's verdict on another charge.

**Petitioner's Actions as a Continuing Course of Conduct with a Single Objective**

Although Petitioner's actions cannot be categorized as a "single incident or transaction[,]" they could still satisfy this Court's rule against duplicitous charges if they can be categorized as a "continuing course of conduct with a single objective[.]" *Cooksey*, 359 Md. at 11, 752 A.2d at 611. Although the Court of Special Appeals' majority determined that Petitioner's actions constituted a single ongoing incident, it also relied on the following quote from *Mohler*, 120 Md. at 327–28, 87 A. at 671–72:

> If the acts alleged are of the same nature and so connected that they form one criminal transaction, they may be joined in one count, although separately considered they are distinct offenses. If they can be construed as stages in one transaction and are not inherently repugnant, the count will not be bad for duplicity.

*Johnson*, 2021 WL 408845, at *3. *Mohler* and this exact quote were used by this Court in *Cooksey* to describe the "continuing course of conduct[]" exception to duplicitious charges. 359 Md. at 12–13, 752 A.2d at 612. Thus, in-as-much as that theory was relied on by the Court of Special Appeals in reaching its conclusion, this Court will consider whether the theory is applicable to Petitioner's case.

*Mohler* involved a defendant charged with a single count of malfeasance in office based on allegations that he had, by virtue of his office, unlawfully and corruptly accused a man of selling goods without a license, corruptly obtained a warrant and arrested that man, coerced him to pay money to a justice of the peace without a trial, and then received part of that sum from the justice of the peace. 120 Md. at 326–27, 87 A. at 671. The court

28

concluded that the single charge of malfeasance in office was not unlawfully duplicitous, reasoning:

> The particular misconduct with which the appellant was charged was that he corruptly obtained money under cover of his office. This was clearly the charge he was called upon to meet. The other averments in the count, although they may have charged distinct and separate offenses, were only recitals of the means taken by him to accomplish the end. Considered as a whole, they constitute but one transaction, and are the steps employed from the beginning to the end. We are therefore of the opinion that the count was not bad for duplicity.

120 Md. at 328, 87 A. at 672.

We conclude that the circumstances and rationale behind *Mohler* are inapplicable to Petitioner's case. Unlike in *Mohler*, Petitioner's actions at the top of the stairs with the rifle and at the bottom of the stairs with the handgun cannot be considered merely steps employed from the beginning to the end of a single transaction. It is not clear from the record that the two incidents were designed to accomplish a single objective. At trial, the State characterized Petitioner's objective in brandishing the rifle at the top of the stairs as continuing his burglary. Such an interpretation is bolstered by the fact that Petitioner did not immediately flee when given the opportunity while Ms. Robin ran downstairs to get her gun. In contrast, Petitioner's objective during the incident at the bottom of the stairs, culminating in the shooting of Ms. Robin's hand, could fairly be characterized as escape. By the time the shooting occurred, Petitioner had dropped his backpack filled with stolen items in order to get through the door. He was no longer, as the State put it, trying "to make his crime succeed[,]" but rather he was trying to get out of the house before the police arrived. Thus, unlike in *Mohler*, the episode with the rifle and the episode with the handgun

29

were not merely the steps from beginning to end of a course of conduct with the same objective.[18]  Petitioner's actions therefore cannot be characterized as a "continuing course of conduct with a single objective[,]" so as to prevent this Court's finding of unlawfully duplicitous charges.  *See Cooksey*, 359 Md. at 11, 752 A.2d at 611.

## CONCLUSION

Based on the record before us, a reasonable jury could have perceived two separate incidents underlying Petitioner's assault and use of a firearm in the commission of a crime of violence charges that were not a part of a continuing course of conduct with a single objective.  As such, we cannot know whether the guilty verdicts as to those charges were based on unanimous findings of guilt with respect to either incident.  Petitioner's convictions therefore do not meet this Court's constitutional standards for unanimity and must be vacated.  *See* MD. CONST., Decl. of Rts. art. 21; U.S. CONST. amend. VI.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED WITH INSTRUCTIONS TO REMAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID BY RESPONDENT.**

---

[18] The fact that these two assaults did not have a single objective is further reflected in the conflict between the Court of Special Appeals' characterization of Petitioner's purpose, and the State's characterization in its brief to this Court.  The Court of Special Appeals stated that both assaults were "in furtherance of the burglary." *Johnson*, 2021 WL 408845, at *3.  In contrast, the State claimed that the single impulse motivating Petitioner in both encounters was escape: "[t]he whole time, Johnson was trying to escape from the house."

Circuit Court for Baltimore County
Case No. 03-K-18-003634
Argued: October 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2021

_____

EVERETTE WILLIAM JOHNSON

v.

STATE OF MARYLAND

_____

Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Dissenting Opinion by Gould, J.,
which Getty, C.J. and McDonald, J., join.

_____

Filed: March 14, 2022

*McDonald, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to Maryland Constitution, Article IV,
Section 3A, he also participated in the decision
and adoption of this opinion.

Mr. Johnson proposes "a modest rule," namely, "[w]hen a defendant is charged with a single count of an offense but evidence of multiple incidents is presented to the jury, the right to a unanimous verdict requires an election by the State or an instruction that a guilty verdict requires unanimous agreement as to which incident supports conviction." The Majority accepts his invitation, holding that:

> [i]n circumstances where a charge is not facially duplicitous, but becomes duplicitous based on evidence of multiple distinct incidents presented at trial to prove a single charged count, . . . the prosecutor should be required to elect between the incidents, or the jury should be provided with a special instruction that they must unanimously agree as to which distinct criminal incident underlies their decision to convict.

My disagreement lies not with the Majority's articulation of the rule, but rather in its application of the rule to this case. As a substantive matter, this rule should not apply here. From the jury verdict, we know that the duplicity problem that concerns the Majority did not, in fact, come to pass. Moreover, on the core issue, I believe the jury was presented with evidence of a single offense of assault and use of a firearm, not separate offenses.

From a procedural standpoint, for the reasons explained below, even if the evidence showed multiple incidents of assault and use of a firearm,[1] Mr. Johnson should not be entitled to benefit from the Majority's holding. From the substance and timing of the specific objection raised at trial, as well as the jury's verdict on each of the charges, the conclusion that Mr. Johnson waived the errors he claims on appeal is, in my view, inescapable.

---

[1] I will use the phrase "use of a firearm" as shorthand for "use of firearm in the commission of a crime of violence."

# I.

## THE FACTS OF THIS CASE DO NOT
## GIVE RISE TO A DUPLICITY PROBLEM

According to the Majority, during Mr. Johnson's singular burglary event at the Robins' home, the jury could have "perceived two distinct assaults and two distinct uses of a firearm in the commission of a crime of violence from the evidence presented and arguments made in Petitioner's trial." Maj. slip op. at 19. The Majority explains that "although the two incidents were separated by only a matter of minutes, there were intervening events between the alleged assault with the rifle at the top of the stairs and the alleged assault with the handgun at the bottom of the stairs." *Id.* I see three fatal flaws in the Majority's reasoning.

*First*, it does not appear that the Majority has fully taken into consideration the ramifications of the jury's actual verdicts. Put simply, we know that the jury unanimously acquitted Mr. Johnson of first-degree assault as to both incidents. The Majority's unanimity concern is, therefore, unfounded. *Second*, in my view, the so-called "intervening events" did not present Mr. Johnson with a fork in the road or time for a new impulse, as the Majority contends. Rather, this was one continuing encounter without a single break in the action. *Third*, the Majority's conclusion is not, in my view, supported by the relevant caselaw. I will address each issue in turn.

## A.

The Majority's fundamental concern is that the jury could have perceived the "alleged assault with the rifle at the top of the stairs and the alleged assault with the

2

handgun at the bottom of the stairs" as separate and distinct incidents, thus creating the risk of a conviction without unanimity. According to the Majority, "[t]his clear demarcation between the uses of the two firearms, in turn, aids in distinguishing between the two assaults, both of which were premised on Petitioner's use of the firearms." Maj. slip op. at 22.

But the jury convicted Mr. Johnson of second-degree assault and acquitted him of first-degree assault. This means that the jury unanimously concluded that although he *did* commit an assault, he didn't commit the assault with either of the two additional elements that elevate second-degree assault to first-degree assault—using a firearm or intending to cause serious bodily injury. The jury's acquittal of Mr. Johnson of first-degree assault rendered moot any concern about the theoretical possibility that the jury could have perceived separate assaults with separate firearms.

We can similarly rule out any unanimity concern with respect to the use of a firearm conviction. From a factual standpoint, there is no dispute that the handgun was discharged during the scuffle at the bottom of the stairs. We also know that the bullet went through Ms. Robin's hand. The only factual issue was whether Mr. Johnson intentionally turned the gun on Ms. Robin and pulled the trigger, as Ms. Robin testified, or whether it was an accident, as defense counsel argued in closing. That the jury acquitted Mr. Johnson of first-degree assault means that the jury was *not* unanimously convinced that Mr. Johnson intended to turn the gun on Ms. Robin and fire it. That means at least one juror thought that the discharge of the handgun was unintended, or put another way, an accident. And if at least one juror thought the discharge was unintended or an accident, then we can safely

3

conclude that the jury did not unanimously find that Mr. Johnson used the handgun to commit the burglary, which was the predicate crime for the use of a firearm charge.

That leaves the use of the Yellowboy rifle as the sole basis for the use of a firearm conviction. One may reasonably question how the use of the rifle could support a conviction on the use of a firearm charge but not be enough to convict on the first-degree assault charge. In my view, these two seemingly inconsistent results are easily reconciled by focusing on the jury instructions for these two charges.

Based on the jury instructions given here, there was an element to the first-degree assault charge that was not part of the use of a firearm charge: that the victim was *in fact* placed in fear. As explained below, the jury was instructed that brandishing a rifle in the commission of a first-degree burglary supported a guilty verdict for the use of a firearm charge. But that instruction did not require the jury to find that Ms. Robin was actually placed in fear. In contrast, one of the elements described in the jury instruction on the intent to frighten version of assault was that the victim was, in fact, put in fear of immediate physical harm. Thus, if the jury was unanimously convinced that Mr. Johnson used the Yellowboy with the intent to put Ms. Robin in fear so that he could complete the burglary without getting apprehended, but the jury was *not* unanimously convinced that his use of the Yellowboy *did* instill fear in Ms. Robin (perhaps because she believed it was inoperable), then a guilty verdict on the use of a firearm charge and acquittal on the first-degree assault charge can coexist.

In sum, the Majority posits the potential for multiple permutations of jury findings that could support the assault and use of a firearm charges, leaving us with no basis to

4

discern if the jury decided the counts unanimously. In my view, based on the evidence presented at trial, the jury instructions, and the jury's actual verdicts, the risk of a non-unanimous verdict as perceived by the Majority ranges from non-existent to *de minimis*; thus, any error would be harmless.[2]

**B.**

I now turn to the Majority's determination that a jury could have reasonably viewed the incidents with the Yellowboy and the handgun as two unique incidents separated by intervening events. The Majority emphasizes two facts in support of this view: (1) the incidents were separated by the time it took Ms. Robin to run down the stairs, go into her bedroom, open her safe, get her pistol, get the loader from the bedside table, load the weapon, all while calling 911; and (2) the fact that Mr. Johnson did not flee the scene

---

[2] The Majority dismisses this analysis on the basis that factually inconsistent and illogical jury verdicts are permitted; therefore, the Majority's argument goes, we can't "deduce . . . which factual incident underlies the jury's conviction for second-degree assault and use of a firearm in a crime of violence." *See* Maj. slip op. at 27 n.17. For starters, the whole point of this analysis is to demonstrate that the jury's verdicts on the specific counts are easily reconciled with the evidence admitted at trial and the jury instructions. Thus, there is no reason to speculate that the jury did not act rationally here. Moreover, this precise type of exercise was conducted by the District of Columbia Court of Appeals in *Hagood v. United States*, on which the Majority relies, when it determined that the failure to give a unanimity instruction did not rise to the level of plain error. *Hagood v. United States*, 93 A.3d 210, 222-24 (D.C. 2014) ("[S]ignificantly, in this case we are able to discern the factual bases for the jury's verdicts from the verdicts themselves, without engaging in speculation about the jury's thought process."). Similarly, in a case cited by the court in Hagood, *Scarborough v. United States*, 522 A.2d 869, 873-75 (D.C. 1987), the District of Columbia Court of Appeals found that the trial court's error in not giving the special unanimity instruction was harmless based on its analysis of the jury's verdict; indeed, the court said it was "not permitted to find reversible error when the only basis for perceiving the jury's verdict was not unanimous would be that the jury acted irrationally." *Id.* at 874. I see no persuasive reason not to engage in the same type of analysis here.

5

during that intervening period. The Majority states that once Ms. Robin ran down the stairs to get her gun, the "alleged threat of immediate bodily harm as a result of Petitioner brandishing the rifle and telling her that it was loaded had come to an end." Maj. slip op. at 21.

The Majority maintains that the "intervening events" provided a "clear opportunity" or a "fork in the road" for Mr. Johnson to leave the house, "but instead [he] affirmatively chose to stay in the exact same place she had left him." *Id.* at 20. The Majority states that "when Ms. Robin ran down the stairs after her initial encounter with Petitioner, it is clear 'the first act ha[d] come to an end and the next act [was] motivated by a fresh impulse[]' pursuant to the fourth *Hagood* factor." *Id.* at 21 (quoting *Hagood*, 93 A.3d at 218)). In my view, when viewed from the relevant temporal perspective, no reasonable assessment of the evidence supports these conclusions.

Let's begin with Mr. Johnson's purpose that day when he entered Ms. Robin's home. Mr. Johnson explained in his custodial interview later that day that he was in the car with a friend who put him up to burglarizing some homes in that neighborhood. The plan was for Mr. Johnson to go in, steal some small items, and get out. There is no evidence that his purpose ever changed during the entire encounter with Ms. Robin. Once Ms. Robin came home, the evidence suggests that Mr. Johnson's overriding purpose was to get out of the house—the third and final part of his burglary plan. In fact, Mr. Johnson said so during his interview—that, after she came home, he just wanted to get out of there.

The Majority describes the steps Ms. Robin took after the scuffle over the Yellowboy rifle in a way that creates the perception of a break in the action and cessation

6

of the threat. In my view, the Majority makes the mistake of viewing the events with the knowledge available only from hindsight. When the events are viewed from both Ms. Robin's and Mr. Johnson's perspective in real time, I do not believe a jury could reasonably find that the burglary incident could be broken down into separate incidents with an intervening period in which the threat had ended.

Ms. Robin came home and found an intruder in her attic, brandishing a rifle. Even if Mr. Johnson had not brandished the rifle, from the perspective of the home's occupants, the presence of an uninvited and unwelcome intruder in the process of a burglary presents a continuous threat against the safety of the persons in the home until the intruder has left the scene for good.

In any event, we know that Mr. Johnson was holding the rifle and that Ms. Robin was aware of that. A rifle in the right hands, even unloaded or inoperable, can be used to inflict serious physical injury—no different than a baseball bat or a golf club. During the so-called intervening period, Ms. Robin did not and could not have known, in real time as the events unfolded, whether the encounter would end without her or her son getting attacked by Mr. Johnson.

The recording of Ms. Robin's 911 call shows just how fast the events unfolded and reveals the urgency in Ms. Robin's voice. Ms. Robin called 911 as she was running down the stairs after trying unsuccessfully to take the rifle away from Mr. Johnson. Her first words in the recording were: "There is an intruder in my house, I'm at [address], I am arming myself." Beginning just 27 seconds into the call, Ms. Robin can be heard yelling to Mr. Johnson: "Do not come downstairs, sir, I am armed and I will absolutely use it. . . ."

7

She continued to threaten to shoot him if he came downstairs and then, beginning just 51 seconds into the call, she tells the 911 operator, "I am holding the man in the attic I really do not want to shoot anyone." From that evidence, no reasonable jury could conclude that, during that "intervening period," the threat abated, or that Ms. Robin perceived that the threat had abated, or that she would not have tried to stop Mr. Johnson if he had attempted to leave the scene.

Viewing the events from Mr. Johnson's perspective yields the same conclusion. In describing the "intervening period" as a fork in the road or an opportunity for Mr. Johnson to act on a fresh impulse, the Majority focuses on what we *now* know happened in that brief time, with the benefit of hindsight. But what did Mr. Johnson know during the 27 seconds that passed from when Ms. Robin called 911 as she was running down the stairs until she ordered him to remain upstairs and threatened to shoot him? We know *now* that Ms. Robin's gun was stored in the closet safe, that it was unloaded, that the bullets were in a table next to the bed, and that she had to load the gun. But how could Mr. Johnson have known that? Mr. Johnson could only have known that the homeowner was scared, armed, and threatening to shoot him. Indeed, for all Mr. Johnson knew, Ms. Robin kept a loaded gun under her pillow and was ready, willing, and able to use it. No reasonable jury would find that Mr. Johnson had a basis to perceive any fork in the road or a reasonable opportunity to leave the scene without risking being shot by Ms. Robin.[3]

---

[3] Relying on *Hagood*, the Majority maintains that we must view the events from the perspective of what a reasonable jury would find. I agree, and my analysis does just that. But the "fork in the road" and "new impulse" factors discussed in *Hagood*, and relied upon

8

The Majority posits that the jury could have concluded that the incidents at the top and bottom of the stairs were not "designed to accomplish a single objective," suggesting that Mr. Johnson's objective could have changed from completing the burglary to getting out of the home. Maj. slip op. at 29. That strikes me as a distinction without a difference. The goal was *always* the same: to get in and get out with as many stolen items as possible. Completing the burglary could never have been accomplished without getting out of the home. There was no basis for the jury to conclude that his objective ever changed— particularly the "get out" part of the plan. Indeed, during his custodial interview, Mr. Johnson told the detectives that "it all happened so fast I just wanted to get out of there[,]" that the incident "unfolded so quickly." In holding that the jury could have concluded that the second incident reflected a change in plan, the Majority erred.

## C.

The Majority does not point to any case from this or any other jurisdiction that resembles the facts of this case. Instead, drawing from *Hagood v. United States*, 93 A.3d

---

by the Majority, derive from caselaw concerning the merger of sentences, where these factors are viewed from the perspective of the defendant. 93 A.3d at 218-19. The court in *Hagood* noted the different perspectives used in the "unanimity and merger analyses," yet acknowledged that applying the "fork in the road" test "may nevertheless be relevant in evaluating, from the jury's perspective, whether it was reasonable for the jury to have concluded that the defendant was involved in one continuous incident or distinct incidents." *Id*. at 219. In other words, looking at the facts from the defendant's perspective is a useful tool in our evaluation of how a reasonable jury could have viewed the evidence. This makes sense—how could a reasonable jury conclude that Mr. Johnson made a choice at a fork in the road if the evidence, viewed from Mr. Johnson's perspective, shows that he could not have been aware that he was even at a fork in the road? In my view, therefore, no reasonable jury could determine whether Mr. Johnson arrived at a "fork in the road" or acted on a "fresh impulse" *unless* it viewed the evidence from Mr. Johnson's perspective.

9

210 (D.C. 2014), the Majority provides a non-exhaustive list of factors to determine whether a group of similar acts may be considered a single incident or transaction. Those scenarios identified in *Hagood* are:

> (1) when the "acts have occurred at different times and were separated by intervening events," (2) when they occurred in different places, (3) "when the defendant has reached a fork in the road and has decided to invade a different interest," or (4) "when the first act has come to an end and the next act is motivated by a fresh impulse."

*Id.* at 218 (quoting *Gray v. United States*, 544 A.2d 1255, 1257 (D.C. 1988)).

*Hagood* involved two separate confrontations between a handful of occupants of an apartment and the two defendants who were initially hanging out outside the apartment building. *Id.* at 219-20. Both confrontations took place in the apartment, separated in time by about 10 minutes. *Id.* at 219. In the intervening period, the defendants were again outside the apartment building, engaging in no unlawful conduct. *Id.* at 214-15. After some hand gestures between one defendant and one of the occupants who was looking at the defendants through a window, the defendants decided to again physically engage the occupants in the apartment. *Id.* at 215. Both incidents involved gunshots. *Id.* at 219-20.

The defendants were charged with single counts of various charges including first-degree burglary while armed and assault with a deadly weapon, among others. *Id.* at 217. Although the events unfolded as two separate incidents, the trial court did not give a special unanimity instruction. *Id.* at 216. On appeal, the District of Columbia Court of Appeals concluded that a jury could have reasonably viewed the events as separate incidents. *Id.* at 219-20. The court framed the issue as "whether we can conclude, upon considering the context of the entire trial, that the jury was in 'substantial agreement as to just what a

10

defendant did' as the factual predicate for the verdict." *Id.* at 219. The court was persuaded that the two incidents involved different conduct by the two defendants, and that there were multiple ways in which the jurors could have viewed the two confrontations. The court found significant that the government characterized the events as "two burglaries" and "two shootings." *Id.* at 220. Thus, the court found that it was error for the trial court not to have given the jury the unanimity instruction.[4] *Id.* at 221.

This case is unlike *Hagood*. In *Hagood*, after the first incident, the defendants and the occupants were separated—thus, no longer were the defendants in the apartment without permission—and no longer were the defendants engaged in an illegal act. The intervening period in *Hagood* marked a clean break from the prior confrontation and afforded the defendants an opportunity to cease all contact with the apartment's occupants. In contrast, here, Mr. Johnson was never *not* engaged in an illegal act during the entire incident, and as set forth above, viewing the events in real time, the intervening period did not afford Mr. Johnson a fresh opportunity.

A case that the court in *Hagood* took pains to distinguish—*Guevara v. United States*, 77 A.3d 412 (D.C. 2013)—is instructive. *See Hagood*, 93 A.3d at 220 n.20. *Guevara* involved a kidnapping that unfolded over the course of about an hour. 77 A.3d at 420. The victim was kidnapped by the siblings of his ex-wife. *Id.* at 415. The two defendants were one of the siblings (Demecio) and Demecio's wife (Angela). *Id.* It all started when one of the siblings demanded that the victim return certain photos. *Id.* The

---

[4] Notably, because the defendants had not requested a unanimity instruction, the court applied the plain error doctrine and, finding no plain error, affirmed the convictions.

11

victim returned some of the photos, but the defendants thought he had more, so they drove the victim to the victim's brother's house to get them. *Id.* After the victim retrieved the additional photos, Demecio "seized" the victim and, with the help of one of Demecio's siblings and Angela, forced the victim into a van driven by Angela. *Id.* Angela made a point to get out of the car and slap the victim before he was shoved into the van. *Id.*

Once in the van, the victim noticed a man he didn't recognize. *Id.* The unknown man drew a knife and threatened to kill him. *Id.* The kidnappers drove the victim around for less than an hour, looking for an empty street. *Id.* During that time, the victim received a call on his cell phone, and the unknown man threatened to kill him if he answered it. *Id.* The kidnappers then pulled the van into a wooded area. *Id.* Demecio and Angela restrained the victim as the unknown man stabbed him multiple times. *Id.* Angela again slapped the victim, this time with one hand while restraining him with the other. *Id.* They carried the victim back to the van, drove around some more, and then dumped him on a road in a different area. *Id.* Demecio threatened to kill the victim if the victim told anyone what they had done. *Id.* at 416.

Post-trial, Angela "filed a motion for judgment of acquittal," which ultimately led to her request for a special unanimity instruction, arguing that the jury heard evidence of three separate threats during the entire kidnapping event. *Id.* at 417-18. The trial court denied the request, and the District of Columbia Court of Appeals affirmed. *Id.* at 418. The court noted that a unanimity instruction is required if the events are legally or factually separate. *Id.* at 419. The court identified the same four factors later discussed in *Hagood* as the factors for determining whether the events were factually separate. *Id.*

12

The court in *Guevara* noted that there were several reasons for concluding that the incidents were not factually separate, including: (1) all of the threats occurred during the kidnapping, that is, "during a single course of criminal conduct"; (2) the threats occurred during a "relatively short time frame" of approximately 45 minutes; and (3) the threats were made "with the same motive, or the same 'original intent': to harm [the victim] and intimidate him into silence." *Id.* at 420. As to the last point, the court rejected Angela's contention that each of her threats was produced by fresh impulses or different motives. *Id.* at 420 n.15.

This case far more closely aligns with *Guevara* than with *Hagood*. In *Guevara*, the assaultive conduct occurred during the kidnapping; here, the assaultive conduct occurred during the burglary. In *Guevara*, the assaultive conduct occurred over a "relatively short time frame" of about 45 minutes; here, the assaultive conduct took place within 5-10 minutes, at most. In *Guevara*, the motive behind the assaultive conduct was the same—to harm the victim and intimidate him into silence—here, the motive was the same throughout—to get out of the Robins' house. In my view, therefore, just as a unanimity instruction was not required in *Guevara*, so too here.[5]

---

[5] In aligning this case with *Hagood* and distinguishing *Guevara*, the Majority points out that the defense in *Guevara* failed to request a unanimity instruction at trial, and the court addressed the issue under a plain error standard of review. But that's what happened in *Hagood* as well—the defense failed to request a unanimity instruction at trial, and the court reviewed the issue for plain error. *Hagood*, 93 A.3d at 217. Notably, although the court in *Hagood* found that the unanimity instruction should have been given, the court concluded that a reversal was not warranted under a plain error review. *Id.* at 214. Moreover, one of the bases on which the court in *Hagood* distinguished *Guevara* was that "the victim was continuously in the presence of his kidnappers throughout the entire

13

## II.

### MR. JOHNSON WAIVED AND FAILED
### TO PRESERVE THE ISSUES RAISED ON APPEAL

Assuming for the sake of argument that Mr. Johnson's duplicity concern was valid, in my view, Mr. Johnson failed to preserve the issue for appeal. I see two categories of waivers here. The first category focuses on: (i) the specific objection made at trial, (ii) the specific errors Mr. Johnson claims on appeal, and (iii) the specific verdicts reached by the jury. The second category involves the timing of Mr. Johnson's duplicity objection.

I will address each in turn.

### A.

It is critical to keep in mind the specific objection that defense counsel eventually asserted. After the State concluded its rebuttal closing argument, defense counsel argued that the State had contended in its opening statement that the first-degree assault and use of a firearm charges were predicated on the gunshot with Ms. Robin's pistol at the bottom of the stairs, but that in the State's rebuttal closing argument, the State also invited the jury to convict Mr. Johnson for both charges based on his brandishing of the Yellowboy at the top of the stairs. In the ensuing colloquy, defense counsel was given multiple opportunities to explain what she was asking the court to do. In response, defense counsel was consistent in requesting that the court instruct the jury that it must only consider the shooting incident

---

ordeal—there was no break in the kidnapping which the factfinder could reasonably perceive to sever the events into distinct criminal acts—and thus we characterized the incident as a 'single course of criminal conduct.'" *Id*. at 220 n. 20. For the same reason, the case at bar more closely aligns with *Guevara* than *Hagood*.

14

at the bottom of the stairs for the first-degree assault and use of a firearm charges.[6]  With

this in mind, I will turn to the specific waiver and failure to preserve issues.

---

[6] The colloquy was as follows:

THE COURT:               Okay. What are you asking me to do?
[DEFENSE COUNSEL]:  I'm asking you to instruct the jury that what they're finding guilty or not guilty of is the allegation of firing the gun through Ms. Robin's hand, and that the firearm we're talking about is the revolver.

***

THE COURT:               So what is it you would -- are specifically asking me to do?
[DEFENSE COUNSEL]:  I would like you to tell them that what the State said is not what they're deciding. They're deciding did he commit a first degree assault when she was injured by the gun in her hand.
      And did he commit a -- did he use a firearm, meaning the revolver, Ms. Robin's revolver in the course of a crime of violence.

***

THE COURT:               You know, so, I -- again, put on the record what you want me to do so the record is clear, [defense counsel].
[DEFENSE COUNSEL]:  I would like to tell them that Mr. Johnson is on trial for a first degree assault and this is a firearm first degree assault, using --
THE COURT:               Why is that? What – what about the serious bodily injury?
[DEFENSE COUNSEL]:  That's -- I guess that's possible, so.
THE COURT:               Well, see I -- I heard testimony --
[DEFENSE COUNSEL]:  I don't –
THE COURT:               -- from the victim that she has problems with her hand. So I think that under the definition of serious bodily injury, and it's directly related to the --
[DEFENSE COUNSEL]:  Okay. Okay.
THE COURT:               Okay. All right.
[DEFENSE COUNSEL]:  He's charged with a single first -- count of first degree assault.
THE COURT:               Okay.
[DEFENSE COUNSEL]:  And that first degree assault it was alleged by the State is that he fired a gun through her hand. It wasn't that he pointed a gun at her in the attic. I understand opening is not evidence.

15

**1.**

Defense counsel's duplicity objection at trial differed from Mr. Johnson's argument on appeal. On appeal, Mr. Johnson argues that the trial court should have given a special unanimity instruction, and short of that, the court should have required the State to elect between the two incidents as the basis for the assault and use of a firearm charges. Mr. Johnson does not explain how the specific instruction his counsel requested at trial—which did not include any derivation of the word "unanimous," let alone the word itself—should be considered a special unanimity instruction. Further, defense counsel at trial did not ask the court to order the State to make an election. In my view, the mismatch between the specific objection at trial and Mr. Johnson's claimed error on appeal constitutes a waiver under Maryland Rule 8-131.[7]

---

[7] Md. Rule 8-131 states:

**(a) Generally.** The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2-322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.
**(b) In Court of Appeals--Additional Limitations.**
(1) *Prior Appellate Decision.* Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals. Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may

16

**2.**

Even if we were to find that there was no mismatch between Mr. Johnson's "ask" at trial and his "ask" on appeal, two facts remain: (1) defense counsel's objection at trial was limited to the first-degree assault and use of a firearm charges; and (2) the jury acquitted Mr. Johnson on the first-degree assault count. Thus, even if the court erred as the Majority holds, such error was harmless beyond a reasonable doubt as to the first-degree assault charge. *See Rubin v. State*, 325 Md. 552, 585 (1992). And because defense counsel's objection did not go to the second-degree assault charge, Mr. Johnson failed to preserve an objection as to that count, as required under Rule 8-131. Therefore, his conviction for second-degree assault should stand.

**B.**

consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition.

(2) *No Prior Appellate Decision.* Except as otherwise provided in Rule 8-304(c), when the Court of Appeals issues a writ of certiorari to review a case pending in the Court of Special Appeals before a decision has been rendered by that Court, the Court of Appeals will consider those issues that would have been cognizable by the Court of Special Appeals.

**(c) Action Tried Without a Jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

**(d) Interlocutory Order.** On an appeal from a final judgment, an interlocutory order previously entered in the action is open to review by the Court unless an appeal has previously been taken from that order and decided on the merits by the Court.

**(e) Order Denying Motion to Dismiss.** An order denying a motion to dismiss for failure to state a claim upon which relief can be granted is reviewable only on appeal from the judgment.

17

I would also hold that Mr. Johnson failed to timely raise the issue, notwithstanding multiple opportunities to do so. *First*, he should have raised the issue through a timely pre-trial motion under Rule 4-252. *Second*, he should have raised the issue with timely objections to the evidence that created the duplicity concern, as such evidence was offered at trial. *Third*, he should have raised the issue through a timely objection to the jury instructions. He did none of this.

**1.**

Mr. Johnson's duplicity objection was, at bottom, a challenge to the validity of the indictment entered by the grand jury. *See Cooksey v. State*, 359 Md. 1, 5-6 (2000). Under Rule 4-252(a), certain "matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise[.]" Relevant here, one such matter is, under subsection (a)(2), "[a] defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense[.]" Under subsection (b), the defendant must file the motion "within 30 days after the earlier of" his counsel's entry of appearance or his first appearance before the court. However, under that same subsection, if grounds for a motion pertaining to a defect in the indictment are disclosed through the discovery process, the defendant can raise the duplicity defect by a motion made "within five days" of receiving said discovery. For the following reasons, I would hold that Mr. Johnson had ample opportunity to raise a duplicity challenge to the indictment in a timely motion under Rule 4-252, and his failure to do so constitutes a waiver of any such defect.

Mr. Johnson was indicted by a grand jury with a general form indictment. The counts in the indictment relevant to Mr. Johnson's appeal were Count 1 for first-degree assault under Section 3-202 of the Criminal Law Article ("CR") of the Maryland Annotated Code (2021), Count 2 for second-degree assault under CR § 3-203, and Count 3 for use of a firearm during the commission a violent crime under CR § 4-204(b).[8] By statute, a charging document for an assault charge need not provide more than the name of the victim, the date of the assault, the county in which the assault occurred, the statute that was violated, and that the violation was "against the peace, government, and dignity of the State." CR § 3-206(a). Because first-degree assault can be charged without including the specific facts and circumstances, one could plausibly assert that a general form indictment of the sort used here does not, on its face, reveal a duplicity problem. Clearly, that's what the Majority assumes here.

But that's not the end of the analysis. Under CR § 3-206(b), a defendant charged with assault is "entitled to a bill of particulars[,]" the purpose of which is "to guard against the taking of an accused by surprise by *limiting the scope of proof*."[9] *See Dzikowski v.*

---

[8] Counts 4 through 10 charged Mr. Johnson with various other crimes during his burglary of the Robins' home, and Counts 11 through 21 charged him with various crimes pertaining to alleged burglaries of other homes. The only counts at issue on appeal are the first three counts.

[9] CR § 3-206(b) provides:

If the general form of indictment or information described in subsection (a) of this section is used to charge a crime described in § 3-202, § 3-203, or § 3-205 of this subtitle in a case in the circuit court, the defendant, on timely demand, is entitled to a bill of particulars.

19

*State*, 436 Md. 430, 447 (2013) (emphasis added) (quoting *McMorris v. State*, 277 Md. 62, 70 n.4 (1976)). Although generally a bill of particulars is not considered in "determining the validity of an indictment[,]" that is not the case if the defendant is statutorily entitled to one. *See State v. Mulkey*, 316 Md. 475, 489 (1989). Thus, Mr. Johnson could have demanded a bill of particulars, and upon receipt of same, could have filed a motion challenging the indictment on duplicity grounds. The record reflects that Mr. Johnson did not demand a bill of particulars.[10]

Another basis to find that Mr. Johnson waived his right to challenge the indictment as duplicitous is grounded in Rule 4-252(b), which permits a defendant to raise a duplicity challenge by a motion made "within five days" of receiving discovery that discloses a defect in the indictment. The facts that supported Mr. Johnson's duplicity challenge were set forth in the statement of probable cause, and again were made known from the State's discovery. The probable cause statement included the following description of the events that day:

> Detective Wisniewski and Detective Lange responded to University of Maryland Shock Trauma Center and spoke with Victim Robin. Victim Robin advised that she came home and recognized that the table lamp in her bedroom was broken. This prompted her to go upstairs in the attic to review their home surveillance system. Victim Robin advised as she walked upstairs into the attic, she observed an unknown male subject holding her rifle, which she knew to be inoperable. She advised that she attempted to remove the rifle out of his hands. Victim Robin advised after attempting to take the rifle, she ran to the bottom of the stairs and slammed the door in an attempt to keep the subject isolated to the upstairs. She advised that she ran to her bedroom and retrieved her .357 revolver. She advised that she yelled to Suspect Johnson "do not come downstairs." She advised that he muttered back "I'll shoot you with the rifle, your husband owes me weed." Victim Robin stated

---

[10] Md. Rule 4-241 governs requests for a bill of particulars.

20

that Defendant Johnson attempted to wrestle the gun from her hands and a brief struggle ensued at the bottom of the stairs. She advised that the defendant stated "I'm going to kill you now, I'm going to kill you." She advised that she continued to wrestle with him and he bit her on the collar bone and then she believes she bit him back on the face. She advised that Defendant Johnson pulled the trigger at which time she suffered a gunshot wound to her hand.

Based on this description, Mr. Johnson was on notice that Ms. Robin had alleged: (1) a physical struggle over the rifle, (2) that Mr. Johnson prevailed in that struggle by keeping possession of the rifle, (3) that she was prompted by fear to retrieve her gun, and (4) that Mr. Johnson threatened to shoot her with the rifle. This description also reveals that Ms. Robin alleged a physical struggle at the bottom of the stairs, that Mr. Johnson bit her, and that he shot her with her pistol. Thus, the ingredients of a potential duplicity problem based on Mr. Johnson's use of two separate firearms as well as other facts constituting various other forms of assault, were all contained in the statement of probable cause.

Additional information was subsequently provided to Mr. Johnson by the State before trial. After the police and medics arrived, Ms. Robin was taken to the hospital, and later that day, she was interviewed by police detectives. Mr. Johnson's counsel received a recording of the interview several days before trial. In that recording, Ms. Robin described the encounter, including the incidents at the top and bottom of the stairs. As to the incident at the top of the stairs, she explained that "he was holding a Yellowboy that my husband was working on," and that "we wrestled for the [rifle]." She also explained that she couldn't remove the rifle from his hands, so she went to get her pistol. The thought occurred to her that "maybe my husband has fixed the [rifle]—I should get my pistol."

21

From this recording, Mr. Johnson knew that Ms. Robin was alleging facts sufficient to show that a threat was made with the Yellowboy rifle at the top of the stairs, and that she was put in enough fear to prompt her to retrieve her handgun.

That defense counsel understood the multiple permutations of fact patterns that supported the charges is evident if we consider the implications behind the substance of defense counsel's objection. Recall that defense counsel's objection was that the State had asserted in its opening statement one basis for the assault charge—firing the handgun—and then in rebuttal invited the jury to convict on another basis—the use of the Yellowboy.[11] The implication behind that objection was that defense counsel had relied on the State's opening statement as providing the basis for the charges, and then was unfairly blind-sided when the State, in its rebuttal, seemingly expanded the charge. But from a waiver or preservation perspective, that begs some important questions. How did defense counsel prepare for trial? Which facts did defense counsel believe, before she had the benefit of the State's opening statement, supported the assault and the use of a firearm charges? Clearly, defense counsel was prepared to address at trial the facts concerning the Yellowboy rifle because, as shown below, she *did* address those facts both in her opening statement and in her cross-examination of Ms. Robin, and quite vigorously at that. Defense counsel's ability to prepare to address such facts at trial shows, in my view, that ample

---

[11] In my view, the State's closing did not invite the jury to look at the incident as separate offenses. When the entirety of the State's arguments are read in context, it appears to me that the State was arguing that there was one continuous assault.

22

information was provided pre-trial for Mr. Johnson to timely raise a duplicity concern. On that basis alone, I would affirm.

**2.**

Proceeding from the premise—incorrect though it is—that there was no duplicity issue discernible from either the charging document or the State's discovery responses, the Majority states that "[t]he same constitutional unanimity concerns arise where the State presents evidence of multiple distinct incidents to prove a crime charged as a single count, namely, that the jury will not unanimously agree as to which criminal incident the defendant committed." Maj. slip op. at 9.

Assuming this premise is true, the critical question left unaddressed by the Majority is what, if anything, should a defendant do to preserve the issue as the evidence comes in at trial? In my view, just as a defendant is required to timely raise a duplicity problem if one is apparent or discoverable from the charging document, so too, we should require a defendant to discern and raise a duplicity problem arising from the evidence as the evidence is admitted at trial. The tools already exist for doing so.

Under Rule 4-323(a), "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent." If the State attempts to introduce evidence that creates a duplicity concern, the defendant has, in my view, the obligation to timely object on all appropriate grounds,

including those set forth in Rules 5-402[12] and 5-403.[13, 14] And if the evidence is deemed admissible for some other purpose (perhaps to prove a non-duplicitous count in the indictment), the defendant has the right to request a limiting instruction under Rule 5-105, which provides that "[w]hen evidence is admitted that is admissible . . . for one purpose but not admissible . . . for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

If we assume for the sake of argument there was a valid duplicity concern, then a timely objection to the evidence, if successful, would have had the salutary effect of requiring the State to tailor its evidence to the specific incident underlying the charge—

[12] Md. Rule 5-402 provides: "Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible."

[13] Md. Rule 5-403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[14] This Court implied in *Cooksey* that objections of that sort would likely be appropriate. 359 Md. 1. In *Cooksey*, the State sought to navigate around a duplicity defect in its indictment and stave off dismissal by advocating for the rule that Majority adopts here—a special unanimity instruction or election by the State at the conclusion of the trial. *Id*. at 25-26. Holding steadfast to the view that duplicity is a pleading issue, we rejected the State's proposal precisely because it would be too little too late. *Id*. at 26. That is, because the evidence supporting the duplicitous charge—much of which would have otherwise been inadmissible—was already admitted, the risk of a unanimity problem was not sufficiently mitigated. *Id*. Defendants are expected to always remain vigilant in identifying grounds to object to evidence, and I see no reason why inadmissible evidence giving rise to a duplicity problem should be treated any differently.

24

that is, using the Majority's formulation of the rule, the State would have been required to make an election.[15]

Alternatively, had Mr. Johnson asserted a timely objection, it is possible the evidence could have been deemed admissible for some other purpose (perhaps to prove a non-duplicitous count in the indictment), in which case Mr. Johnson could have requested a limiting instruction under Rule 5-105, which provides that "[w]hen evidence is admitted that is admissible . . . for one purpose but not admissible . . . for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Under that scenario, Mr. Johnson would have been granted the functional equivalent of the limiting instruction he later requested, but at a time when the State could have adjusted its trial presentation accordingly.

Put simply, if we are going to hold that the court must give a specific unanimity instruction or require the State to make an election when a duplicity issue first arises from the evidence admitted at trial, there is no sound reason to treat the admission of such problematic evidence any different from the way all other objectionable evidence is treated. That means that unless a timely objection is made as required by Rule 4-323, any error arising from the admission of such evidence should be deemed waived.

Here, requiring a timely objection would be fatal to Mr. Johnson's appeal. In its opening statement, the State described the events at the top of the stairs as follows:

> She goes up to the attic. Gets up into the attic, and that's where she encounters Mr. Johnson. She encounters Mr. Johnson holding a rifle, and it

---

[15] And if the objection had been overruled, then the issue would have been preserved for appeal.

25

was a rifle that belonged to the Robins, the homeowners, because they have guns.

He racked the lever, told her it was loaded. There was a brief struggle over that gun, and upstairs in that attic, fortunately, Solomon was not up there with her, her son, he was still downstairs. She screamed for him to get out. To go wait outside .

So it was at that point after Mr. Johnson racks the -- the lever on that rifle she disengages. She goes back downstairs. She closes that attic door. She goes to get her own gun out of her safe in her bedroom. And she loads that gun.

The State further explained in its opening that Mr. Johnson ratcheted up the burglary to a "different level by arming himself. By picking up that rifle that was up in the attic. By threatening Ms. Robin. By trying to scare her to get her out of there so he could make his get away." Thus, from the very beginning of the trial, it was evident that the State intended to prove that the events at the top of the stairs supported the counts for first-degree assault and use of a firearm. Certainly, Mr. Johnson's counsel was prepared for that line of attack because, after acknowledging in her opening statement that Mr. Johnson committed a burglary, she addressed those facts head-on, telling the jury that Mr. Johnson did not intend to put Ms. Robin in fear when he held the Yellowboy, and that Ms. Robin knew the rifle was inoperable; therefore, she was not, in fact, put in fear.[16]

---

[16] Defense counsel stated:

This case is about a burglary. It's about a burglary that went terribly wrong. Um, the homeowner Mrs. Robin came home. She knew the house -- or she thought the house was in disarray. So instead of taking her son out immediately and calling 911, she chose to go into the house and look around.

She does go up to the attic where he is standing, holding a gun called -- which she calls a Yellowboy, which is an old fashioned lever type rifle.

Um, she knew that that gun was inoperable. She knew that her husband was working on that gun. And he wasn't threatening her with the

As foreshadowed by the State's opening, evidence of an assault with the Yellowboy at the top of the stairs was presented in the State's prima facie case through Ms. Robin's testimony, all of which was admitted without objection.[17]  Such evidence was not, as far as I can tell, relevant to any counts other than the assault and use of a firearm charges.  Mr. Johnson could have objected to such evidence pursuant to Rules 5-402 and/or 5-403.  Alternatively, Mr. Johnson could have asked the trial judge to instruct the jury pursuant to Rule 5-105 that it may not consider such evidence for the first-degree assault and use of a firearm charges.  Mr. Johnson did neither.

Instead, defense counsel tackled the issue in her cross-examination.  Focusing on the events that transpired at the top of the stairs, defense counsel attempted to demonstrate that Ms. Robin knew the rifle wasn't loaded and that she thought Mr. Johnson's demeanor was relaxed, all with the implication that she was not put in fear.[18]  Again, as far as I can

---

gun. He was holding it potentially as something he may have thought about stealing.

[17] The Majority describes her testimony at length, thus, it will not be repeated here.

[18] Such cross-examination included:

QUESTION: Um, now I want to -- I have a couple more questions about the Yellowboy.  You've said you have a practice in your home of keeping guns locked away?
ANSWER:    Yes.
QUESTION: For safety reasons?
ANSWER:    Right.
QUESTION: If a gun works you've got to put it away in the safe if you're not using it?
ANSWER:    That is certainly the goal.

27

QUESTION: And the cowboy guns, they're real guns, they can really hurt somebody?
ANSWER: Yes.
QUESTION: So, you were aware that had the gun been functioning, your husband would have put it in the safe?
ANSWER: I was aware that had that gun been functioning, it not be 1 o'clock in the morning and my husband exhausted and in pain, he would have walked down two flights of stairs, gone through the four to the left, three to the right, two the left, turn clack, pull, open and put it away, and then walked back up and a flight of stairs to go to bed.
QUESTION: And the last, um -- the last information you had regarding the Yellowboy was that it wasn't functioning?
ANSWER: Correct.

***

QUESTION: You were confident --
ANSWER: Right.
QUESTION: -- at that point it wasn't loaded?
ANSWER: Absolutely.
QUESTION: All right.
ANSWER: I thought it didn't work.
QUESTION: And you heard yourself on 911, basically screaming at him on two occasions, I think, that -- "that's not loaded"?
ANSWER: Right.
QUESTION: And would you agree on that 911 tape you're not expressing any fear of the Yellowboy, are you?
ANSWER: I think the only thing I'm expressing fear of is him coming down the damn stairs.

***

QUESTION: You characterized Mr. Johnson's demeanor as very calm?
ANSWER: Yeah, it was weird.
QUESTION: So from the moment you first went up to the attic, um, that's what struck you, he's calm?
ANSWER: It was blank.
QUESTION: He had a flat affect?
ANSWER: Yes.
QUESTION: What does that mean "flat affect"?
ANSWER: Not a lot --

28

tell, none of this testimony was relevant to any charges other than assault and use of a firearm. I would therefore hold that Mr. Johnson's failure to object to the admission of the evidence or request a limiting instruction under Rule 5-105 constitutes a waiver of the issue on appeal.

**3.**

Even if Mr. Johnson is excused from failing to timely raise the issue pre-trial or as the evidence came in, then, in my view, he should have raised the issue, at the very latest, when the court instructed the jury. Rule 4-325(f) provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party

---

QUESTION: No --
ANSWER:   -- of expression in his face. He was very, almost like automata. He was -- he was -- he was weird. I mean, normally you would think, oh, crap, I got caught. I should run away. There was none of that. Oh, I've been busted. You know, it was just this flat, nothing, super weird.
QUESTION: No emotions were expressed toward you?
ANSWER:   No.
QUESTION: He wasn't at any point, um, I'm talking prior to the whatever the gun incident was down in the hallway, um, he wasn't yelling at you?
ANSWER:   Correct.
QUESTION: He wasn't expressing anger toward you?
ANSWER:   He wasn't expressing anything.
QUESTION: Even when you -- you say you tried to take the Yellowboy from him he didn't have any of those emotions?
ANSWER:   He just said "this things loaded."  And yanked it back.
QUESTION: Uh, he was if -- if you could hear him speaking at all he was muttering or mumbling?
ANSWER:   Well, he didn't mutter in the attic. He very clearly spoke "this things loaded", and then racked the lever. And then, he said something about weed, but my blood was rushing in my ears and I couldn't -- I wasn't really hearing a whole lot at that point.

29

objects and the grounds of the objection." The Majority gives Mr. Johnson a pass for failing to comply with this requirement.

As to the assault charges, again recall that Mr. Johnson's objection was that the State informed the jury in its opening statement that the first-degree assault charge was based on the shooting incident at the bottom of the stairs, and that in closing, the State suggested the Yellowboy incident at the top of the stairs as another basis for first-degree assault. If Mr. Johnson truly believed, based on the State's opening statement, that the first-degree assault charge was limited to the shooting at the bottom of the stairs, then, in addition to timely objecting to the evidence, as discussed above, Mr. Johnson should have objected to the jury instructions that provided the jury with an alternative path to a conviction for first-degree assault.

There are three distinct types of second-degree assault: "(1) intent to frighten, (2) attempted battery, and (3) battery." *Jones v. State*, 440 Md. 450, 455 (2014) (citing CR § 3-203 and quoting *Snyder v. State*, 210 Md. App. 370, 382 (2013)). The jury instruction for second-degree assault in the Maryland Criminal Pattern Jury Instructions provides a separate version for each type. *See* MPJI-Cr 4:01 (providing version "A" for intent to frighten, version "B" for attempted battery, and version "C" for battery). The Notes on Use for this instruction offer two pieces of advice relevant here. *First*, only the versions that are generated by the facts of the case should be used. *Second*, although the attempted battery and battery versions "may both be applicable, it is unlikely that both" the intent to frighten and battery versions would be applicable in the same case.

30

First-degree assault includes each of the elements of second-degree assault, plus at least one of the following two elements: (1) use of a firearm to commit the assault; or (2) an intention by the defendant to inflict serious physical injury in committing the assault. *See* MPJI-Cr 4:01.1A. Based on these pattern instructions, if the first-degree assault charge had been predicated solely on the shooting at the bottom of the stairs—which was the premise of defense counsel's objection—then only the battery version of the second-degree assault instruction would have been appropriate. Yet the court, without objection by defense counsel, instructed the jury on both the intent to frighten and battery versions of assault.[19] By failing to object to the instruction that gave the jury an alternative path to an assault conviction, I would hold that Mr. Johnson waived the issue on appeal.

---

[19] Relevant here, the judge instructed as follows:

> There are two -- actually, there's several ways in one may commit a second degree assault, those that are applicable in this case are what we call intent to frighten or battery.
> An intent to frighten type of second degree assault is as follows. Assault is intentionally frightening another person with the threat of immediate offensive contact or physical harm.
> In order to convict the defendant of the intent to frighten form of second degree assault the State must prove, that the defendant committed an act with the intent to place Jeanne Robin in fear of immediate offensive physical contact or physical harm. That the defendant had the apparent ability at the time to bring about offensive physical contact or physical harm.
> That Jeanne Robin reasonably feared immediate offensive physical contact or physical harm. And this -- the defendant's actions were not legally justified.
> Now, I'm going to describe the battery form of second degree assault. Assault is causing offensive physical contact to another person. In order to convict the defendant of the battery form of second degree assault the State must prove that the defendant caused offensive physical contact or physical harm to Jeanne Robin. That the contact was the result of an intentional or

The same goes for the use of a firearm charge.  The jury was instructed that to convict on that count, the State "must prove that the defendant committed first degree

reckless act of the defendant and was not accidental. And that the contact was not consented to by Jeanne Robin and was not legally justified.

*** 

In order to prove the defendant committed a first degree assault of Jeanne Robin, the State must prove the intent to frighten or battery form of second degree assault, and must also prove that the defendant used a firearm to commit the assault or intended to cause serious physical injury in the commission of the assault.

A firearm is a weapon that propels a bullet by gunpowder or similar explosive.

Serious physical injury means an injury that creates a substantial risk of death or causing serious and permanent or serious and protracted disfigurement or loss or impairment of the function of anybody -- any bodily member or organ.

And as to the use of a firearm charge, the court instructed:

The defendant is charged with the use of a firearm in the commission of a felony or crime of violence. First degree assault and first degree burglary both are felonies and crimes of violence.

In order to convict the defendant of use of a firearm in the commission of a crime of violence the State must prove that the defendant committed first degree assault and/or first degree burglary.  That the defendant used a firearm in the commission of first degree assault and/or first degree burglary.

A firearm is a weapon that fires, is designed to fire or may readily be converted to fire a projectile by the action of an explosive such as gunpowder or -- or the frame or receiver of such a weapon.

A firearm in this context includes an antique firearm, handgun, rifle, shotgun, short barrel rifle, short barrel shotgun, starter gun or any other firearm whether loaded or unloaded.

Use of a firearm includes brandishing, displaying, striking with, firing or attempting to fire a firearm in the furtherance of the felony or crime of violence.

A person uses a firearm when he uses it to create fear of harm.

The defendant need not -- need not injure anyone with the firearm, however, mere possession of a firearm at or near the crime is not sufficient.

32

assault and/or first degree burglary" and that he "used a firearm in the commission" thereof. We know that the jury acquitted Mr. Johnson of first-degree assault, leaving first-degree burglary as the sole possible predicate for that charge. Mr. Johnson conceded to the jury that he was guilty of first-degree burglary; thus, the only issue was whether he used a firearm while doing so. On that issue, the trial judge instructed the jury that "[u]se of a firearm includes *brandishing*, displaying, striking with, firing or attempting to fire a *firearm* in the furtherance of the felony or crime of violence." (Emphasis added). The jury was also instructed that the definition of "firearm" included "an antique firearm, handgun, *rifle*, shotgun, short barrel rifle, short barrel shotgun, starter gun or any other firearm whether loaded or unloaded." (Emphasis added). In sum, the jury was instructed without objection by defense counsel that Mr. Johnson could be found guilty of first-degree assault if he *brandished* a *rifle* in the commission of the first-degree burglary. If defense counsel believed that only the handgun incident was in play for the use of a firearm charge, it was incumbent on defense counsel to timely object to the instruction that provided an alternative basis to convict on that count. The failure to do so constitutes a waiver of this issue on appeal.

***

As discussed above, Mr. Johnson had multiple opportunities to spot and raise the duplicity issue before the closing arguments, starting with the charging document and ending with the jury instructions. Indeed, Mr. Johnson confronted and addressed the facts *at trial* that gave rise to his belatedly raised duplicity concern. Given the constitutional right at stake—the right to a unanimous verdict—a defendant should be required to raise

such a concern at the earliest possible time, because otherwise, as explained below, the defendant could time the duplicity objection to secure and optimize an unfair tactical advantage.

Under Rule 8-131(b)(2), this Court ordinarily does not address issues that were not raised in the petition or cross-petition for certiorari, and on that basis, the Majority declines to address the foregoing waiver issues. I disagree with that approach. *First*, when subsections (a) and (b) of Rule 8-131 are considered together, it seems to me that one party's failure to raise a waiver issue does not require an appellate court to give the other party a pass for failing to properly preserve an issue in the trial court. *Second*, at a minimum, any review of the issue should be conducted under the more stringent plain error standard, as the courts did in *Hagood* and *Guevara*. *Hagood*, 93 A.3d at 221-25; *Guevara*, 77 A.3d at 423. The Majority's failure to do so here was a mistake.

The potential fallout from not addressing or acknowledging Mr. Johnson's failure to preserve the issue in the trial court is too significant to ignore. In close call cases, it may not be so easy for the State, acting in good faith, to determine whether separate incidents should be charged as a single offense or as separate offenses. For example, here, if the State had charged Mr. Johnson with multiple counts of assault—for the threat with the Yellowboy, the hitting, the biting, and the shooting at the bottom of the stairs, or some combination thereof—then Mr. Johnson could have challenged the indictment on multiplicity grounds.

If the State errs on the duplicitous side by including multiple incidents in a single count, the defect in the indictment cannot be cured by an amendment, and, therefore, is

subject to dismissal.  *See State v. Beers*, 21 Md. App. 39, 43-44 (1974); *Cooksey*, 359 Md. at 27.  However, all is not lost for the State because it can rectify the problem by filing a superseding indictment that charges each offense in separate counts.  *See Tracy v. State*, 319 Md. 452, 456-57 (1990); *State v. Ferguson*, 218 Md. App. 670, 684-85 (2014).

On the other hand, if the State errs on the multiplicity side by charging the defendant with separate offenses, the worst that can happen is that "[t]he court may respond to a successful objection by requiring the prosecutor to elect one count, consolidating the various counts, or simply advising the jury that only one offense is charged."  *Albrecht v. State*, 105 Md. App. 45, 56 (1995) (quoting 2 W.R. LaFave & J.H. Israel, CRIMINAL PROCEDURE § 19.2(e) at 457-58 (1984)).  Thus, whether the indictment is duplicitous or multiplicitous, so long as the issue is timely raised, the State will have the opportunity to fix the problem before it's too late and the case could then be decided on its merits.

The defendant's timing in raising the issue matters.  From a defendant's standpoint, the benefit of a successful duplicity challenge—protection of the right to a unanimous verdict—comes with the risk that he may very well get what he asks for, in which case, he could face the risk of multiple sentences for what could be viewed as a single offense.  Depending on the facts of the case, a rational defendant may not wish to take that chance.  For example, here, Mr. Johnson could have rationally decided not to make a duplicity objection under Rule 4-252(b) out of concern that he could be charged, convicted, and sentenced for two separate first-degree assaults.  Thus, if a defendant is required to timely raise the issue, there would no strategic advantage to raise a duplicity objection unless he

35

truly believes his right to a unanimous verdict would otherwise be imperiled. That's as it should be.

By the time closing arguments are concluded, however, the risk/benefit calculus has shifted significantly in the defendant's favor. By then, jeopardy has already attached, thereby precluding the State from filing a superseding indictment. *Ferguson*, 218 Md. App. at 685. At that point, making a duplicity objection and requesting a special unanimity instruction is all upside and no downside for a defendant in Mr. Johnson's position. If the defendant is permitted to raise the issue after closing arguments, the worst that can happen is that the trial judge declines. On the upside, however, if the court grants the request, then the jury will be instructed that it cannot convict unless they unanimously agree precisely when and how—out of multiple possibilities—the offense was committed. Such an instruction at that juncture surely increases the odds of an acquittal. And the jury is being so instructed after jeopardy attached, so it's too late for the State to fix the problem.

It's an ingenious tactic. As a result of the Majority's decision, Mr. Johnson and defendants in a similar position will get the benefit of separating the incidents into separate offenses, without exposing themselves to the associated risk of multiple convictions and sentences. Such a result strikes me as patently unfair and unjust. Further, I am concerned that to prevent a recurrence of this scenario, when faced with the choice of erring on the side of duplicity or multiplicity in future close call cases, the State might prefer to risk a multiplicity challenge by charging separate offenses. In the aggregate, that would, in my view, redound to the detriment of future defendants in similar situations.

## CONCLUSION

For the foregoing reasons, I respectfully dissent.

Chief Judge Getty and Judge McDonald authorize me to state that they join in this dissent.